# THE SERVICES NATIONAL BANK

v.

# BURKE & HERBERT BANK & TRUST COMPANY, ET AL.

April 20, 1979.

Record No. 781457.

Present: All the Justices.

*Frank E. Brown, Jr. (Barham, Radigan, Suiters & Brown, P.C.,* on brief), for appellant.

*Charles E. Pikrallidas; William F. Schutt (Thomson, Pikrallidas & Schott,* on briefs), for appellees.

CARRICO, J., delivered the opinion of the Court.

By application filed with the State Corporation Commission, Burke & Herbert Bank & Trust Company of Alexandria (hereinafter, Burke & Herbert) sought authority to establish a branch office in the neighboring county of Arlington. The Services National Bank (hereinafter, Services), whose only banking facility is located near the site of the proposed branch, intervened and protested the granting of the application. The gist of Services' protest was that its financial soundness would be jeopardized by establishment of the proposed branch.

After a hearing, the Commission entered a final order granting Burke & Herbert's application. The order did not mention specifically the subject of jeopardy to the financial soundness of existing institutions, but stated that establishment of the proposed branch would serve the public convenience and necessity. After Services filed notice of appeal, the Commission rendered a written opinion in which it found expressly that establishment of the proposed branch would not jeopardize the financial soundness of Services or of any other existing institution.

Services is here upon an appeal of right. In its briefs and in oral argument, it has discussed a variety of questions. We believe, however, that the assignments of error as framed by Services present only two questions, *viz.,* (1) whether the Commission's final order is legally insufficient because it does not contain a specific finding that Services' financial soundness will not be jeopardized by establishment of Burke & Herbert's proposed branch, and (2) whether the finding of no jeopardy to Services, contained in the Commission's written opinion, is contrary to the evidence or without evidence to support it.

With respect to the first question, Services argues that, in granting an application for a branch bank, the Commission not only must find that the financial soundness of existing institutions will not be jeopardized but also must set out the finding in the order granting the application, or else the order must be declared legally insufficient. On the other hand, Burke & Herbert argues that the effect of a proposed branch bank upon existing institutions is only one of several factors the Commission must consider in determining public convenience and necessity, and where, as here, the Commission finds in its order granting an application that public convenience and necessity will be served, this finding necessarily includes a determination that the public benefits of the proposed facility outweigh any possible adverse effects upon existing institutions. In any event, Burke & Herbert says, it suffices if the finding concerning jeopardy is contained in the Commission's written opinion.

We agree with Burke & Herbert. Pursuant to Code § 6.1-39(c), a branch bank may be authorized when the Commission is "satisfied that public convenience and necessity will thereby be served."* While jeopardy to existing institutions is not mentioned specifically in the statute, the Commission and this Court traditionally have considered that an inquiry into the public convenience and necessity of a proposed banking office necessarily involves an examination of the effect the proposal will have upon existing institutions. *Covington Bank* v. *State Bank*, 219 Va. 566, 573, 249 S.E.2d 163, 167 (1978); *Security Bank* v. *Schoolfield Bank*, 208 Va. 458, 462, 158 S.E.2d 743, 745-46 (1968).

Nothing in the statute or any of our decisions, however, indicates that the order granting the application for a banking office must contain a specific finding concerning jeopardy to existing institutions. And nothing advanced by Services in this case persuades us to adopt such a requirement now. Accordingly, we hold that where, as here, the Commission has inquired into the effect the proposed banking office will have upon existing institutions, has found in its order that establishment of the office will serve the public convenience and necessity, and has made a finding in its written opinion concerning jeopardy to the financial soundness of existing institutions, all requirements of law have been satisfied.

---

*A 1978 amendment to § 6.1-39(c), effective after the present case was decided, substituted "public interest" for "public convenience and necessity."

■ We turn now to the question whether the Commission's finding of no jeopardy to Services is contrary to the evidence or without evidence to support it. Consideration of this question requires that the evidence be set out in some detail.

Burke & Herbert, an independent bank operating since 1852, has its main banking office and all five of its present branches in the City of Alexandria. Its financial soundness and ability to sustain an additional branch are not questioned.

Burke & Herbert proposes to establish an additional branch in Arlington County on a site at the southwest corner of 23rd and South Eads Streets, one block west of Jefferson Davis Highway, a busy traffic artery slated for possible reconstruction as a limited access route. The site of the proposed branch is some 500 feet distant from Services' banking office, which is located in Crystal City, a high-density office, commercial, and residential complex on the east side of Jefferson Davis Highway.

In the primary trade area delineated by Burke & Herbert, property is devoted to a variety of uses, with some sections undeveloped. Dominating the area is Crystal City where, in the same block that Services has its office, another bank and a savings and loan association maintain offices. Crystal City houses some 5,000 to 6,000 residents and provides employment for approximately 20,000 persons. The primary trade area also includes a large residential section west of Jefferson Davis Highway. Burke & Herbert hopes to attract the banking business of this section with a "neighborhood, personalized service"; its proposed office will provide drive-in window facilities, a service not furnished by Services or its neighbor bank in Crystal City. A total of six banking and three savings and loan offices serve the primary trade area.

Between the northern boundary of the primary trade area and the nearby Pentagon Building, where 30,000 persons are employed, lies a section that includes the site of a proposed development to be known as Pentagon City. This development will contain a retail center, a major hotel, office buildings, and residential housing. Also planned for the same section is a large residential complex to include housing and nursing care units for the elderly. Three banking offices now serve the section in which these developments are planned.

For statistical purposes, the counties of Arlington, Fairfax, Prince William, and Loudoun, and the cities of Alexandria, Fair-

fax, Falls Church, Manassas, and Manassas Park comprise an area (hereinafter, the Area) which is heavily populated and has a high level of income and commercial and financial activity. During pertinent study periods, the Area surpassed the state as a whole in rate of growth of population, total personal income, per capita income, retail sales, savings and loan deposits, and, except for one year, bank deposits.

With particular reference to Arlington County, data submitted below show that its population declined 11.9% during the period 1970-76, while the Area grew at a rate of 10.5% and the state as a whole at a rate of 8.2%. Arlington, however, ranked second only to Fairfax County as the most populous jurisdiction in the Area. Arlington also ranked second in the Area in total personal income, per capita income, retail sales, total bank deposits, and total savings and loan deposits. But Arlington tended to trail other jurisdictions in rate of growth in these categories. For example, in total bank deposits, Arlington's growth rate of 66.5% during the period 1970-76 lagged behind the Area rate of 100.4% and the statewide rate of 92.2%. In per capita bank deposits and per capita savings and loan deposits for the year 1976, however, Arlington was well above both the Area and the statewide averages in both categories.

A total of 301 banking offices operate in the nine jurisdictions comprising the Area. Two banking firms control 30.8% of the deposits. Of the remaining 69.2%, Burke & Herbert controls 1.6%, and Services controls .3%.

Services opened for business in temporary quarters in early 1974, moving to its present location in July of that year. Capitalized and organized by a group composed primarily of military officers, Services originally planned to gear its strategy to filling the banking needs of the military customer, wherever he might be stationed. Encountering opposition from the Comptroller of the Currency because of his belief that banks should provide a community service, the organizing group endeavored to develop more local appeal. Although unable to offer preferential treatment to members of the military, Services' peculiar orientation toward the military has provided a source of prospective customers among the armed forces and employees of the Department of Defense. Interestingly, the bank draws only about half its business from local sources.

In 1974 and 1975, the first two years it was open for business, Services operated at a loss. At the end of 1974, however, it had acquired deposits of $2.5 million and assets of $4.8 million. By year's end 1975, deposits had increased 108% to $5.2 million and assets had grown to $7.5 million. Then, in 1976, deposits increased 41.4% to $7.3 million, a deposit base, according to the annual report, sufficient to support Services' fixed operating expenses. The year 1976 also showed an increase in assets to $9.8 million and the production of Services' first profit, in the amount of $ 76,809.

In 1977, however, despite a growth of 28% in deposits to $9.4 million and an increase in assets to $11.8 million, Services showed a loss of $21,714. This loss resulted from the decision of new management to charge off at one time $175,000 in loans that were considered "not realistically collectible." New management also purchased at high rates of interest $1 million in large certificates of deposit for the purpose of reducing an unacceptable 100% loan-to-deposit ratio.

The 1977 loss also further impaired Services' capital. From an initial paid-in figure of $2.5 million, the capital account had declined to $2.29 million by the end of 1975, reflecting the first two years' losses, had increased to $2.376 million as a result of the profitable year in 1976, and then had declined to $2.354 million after the 1977 loss.

Burke & Herbert estimated that its proposed branch would generate deposits of $500,000 in the first year of operation and an additional $1 million annually in the next two years. Based upon what it termed conservative figures, Burke & Herbert predicted that the branch would operate at a loss for the first three years, but would show a profit in the fourth year.

Services' objections to Burke & Herbert's application were voiced before the Commission by Marshall Groom, Services' president, and Lewis N. Dembitz, an independent expert.

Groom opined that until his bank was able both to correct the instability in its deposit base caused by the purchase of costly certificates of deposit and to restore capital funds to their initial levels, Services would be harmed by the entry of another branch bank into an area presently not experiencing any growth. Dembitz expressed the opinion that Services should be protected from Burke & Herbert's competition "for a while longer" to give Services an opportunity "to develop enough earnings to restore its

capital." Dembitz stated further that "it would be unfair and contrary to public policy for Burke & Herbert to be permitted to open an unprofitable branch, which admittedly would be subsidized by the parent bank for at least three years, when the effect is to draw business away from Services before that Bank has been able to restore its capital to its initial level."

In its written opinion, the Commission analyzed the economic data that had been submitted and considered the parties' conflicting views concerning the conclusions to be drawn therefrom. Acknowledging that Arlington County had declined in population and that it trailed other jurisdictions in rates of growth, the Commission found, nonetheless, that the county's "location in the heart of a flourishing metropolitan area gives assurance of its continued development." With respect to the particular trade area where Burke & Herbert proposed to open its branch, the Commission found that "the economic and banking viability of the trade area is good; the prospect of future growth in the area lends support to the proposed branch's feasibility, to the need of the public for an additional banking facility, and to the conclusion that there will be enough business to support comfortably all bank offices in the area."

Concerning Services' plea for protection from competition "for a while longer" in order to stabilize its deposit base and to restore its capital, the Commission agreed that caution should be exercised in permitting additional competition where new institutions are attempting to establish themselves. The Commission stated, however, that the duration of protection and the risks against which such protection should be afforded were matters for the exercise of the Commission's judgment.

The Commission then pointed out that, in terms of time and deposit volume, Services already had passed the point where new banks usually make a profit. Indeed, the Commission observed, Services had made a profit in 1976 and would have repeated the performance in 1977 but for the extraordinary charge-off of loan losses in the latter year. Accordingly, the Commission found that Services "*has* had a reasonable opportunity to recover its initial losses."

Further, noting Services' healthy deposit growth and its steady improvement in operating earnings, the Commission found that Services' failure to generate cumulative profits resulted, not from

excessive competition, but from internal causes and that its capital deficit resulted, not from market forces, but from management policies. In any event, the Commission observed, with the policies instituted by new management, Services' "recovery is well under way," and it should be able to restore its capital accounts by the time, or soon after, Burke & Herbert opens its proposed branch.

The Commission found further that the impact of the proposed branch upon Services' deposit growth "will not be substantial." Services, the Commission said, had achieved solid growth against strong competition, while operating in the same block with another banking office and a savings and loan office. Services' appeal to the military customer, the Commission noted, gave it a source of accounts that would not be appreciably affected by Burke & Herbert's branch. And, the Commission said, Services' location in Crystal City gave it the advantage of greater convenience to residents and workers in that complex.

Finally, the Commission considered the objection voiced by the witness Dembitz concerning the anti-competitive effect of permitting Burke & Herbert to subsidize losses of its branch for a period of three years at the expense of drawing business from Services. The Commission observed that, generally, such subsidization should not be permitted to continue "too long where the effect of that practice will be to injure competing banks." The Commission stated, however, that it found in the evidence no basis for concluding that such a situation exists in the present case.

Concluding, the Commission stated that it was unpersuaded that establishment of the proposed branch would threaten Services' financial soundness. It believed, the Commission said, that Services was requesting "longer and greater protection than it reasonably needs."

Thus, upon the evidence, the Commission found that neither from the standpoint of the economic situation in the area nor from the viewpoint of Services' own particular status would the establishment of Burke & Herbert's proposed branch pose a threat to Services' financial soundness. A finding of the Commission is presumed to be correct, and it will be set aside only if it is contrary to the evidence or without evidence to support it. *Old Dominion* v. *Colony Savings* 219 Va. 586, 591, 249 S.E.2d 167, 170 (1978). Under the circumstances of this case, we cannot say that the Commission's finding concerning jeopardy to Services' financial soundness is contrary to the evidence or without evidence to support it. Accordingly, the Commission's order will be affirmed.

*Affirmed.*