## Richmond

### FRONT ROYAL SAVINGS & LOAN ASSOCIATION

### V.

### FIRST VIRGINIA BANK SHENANDOAH VALLEY, ET AL.

June 12, 1981.

Record No. 801957.

Present: All the Justices.

*James M. Thomson; Charles E. Pikrallidas (Thomason, Pikrallidas & Schott,* on brief), for appellant.
*William F. Schutt; Edward L. Breeden, III (Lewis S. Minter; Breeden, Howard & MacMillan,* on briefs), for appellees.

POFF, J., delivered the opinion of the Court.

The central question presented by the appellant in this appeal from a State Corporation Commission order granting a bank's application for a new branch is whether, in determining "public interest", the Commission gave due consideration to "possible adverse effects to existing institutions."

On October 26, 1979, First Virginia Bank-Shenandoah Valley (FVB) filed an application to establish a branch bank in Front Royal, the county seat and principal commercial center of Warren County, the primary service area. Earlier that year, the Commission had authorized Front Royal Savings & Loan Association (FRS&L) to establish an office in Front Royal. *See Shenandoah S & L* v. *Front Royal S & L,* 220 Va. 718, 261 S.E.2d 325 (1980), affirming the Commission's order. Protesting FVB's application, FRS&L alleged, *inter alia,* that the proposed branch "will create excessive competition . . . detrimental to the community" and "will particularly jeopardize the financial soundness of the Protestant and the other licensed financial institutions".

The Commission conducted a hearing on April 24, 1980 at which FVB called several witnesses to supplement its pre-filed evidence. FVB, an affiliate of First Virginia Bank Holding Company, has five offices in Shenandoah County with total deposits of $54.6 million and total assets of $60.3 million. Warren County, adjacent to Shenandoah, has three banks with a total of seven offices (all

but one of which are located in Front Royal) and one savings and loan association, First Federal Savings & Loan Association. These three banks have total deposits of $32.5 million, $29.1 million, and $10.7 million, and First Federal has $14.7 million.

Warren County's population, essentially static in the 1960 decade, experienced a growth rate of 29.4% in the next nine years. Current projections indicate that the 1980 population will increase 31% by 1990. The county's economy is dependent primarily upon manufacturing and, to lesser degrees, upon agriculture and tourism. Between 1973 and 1978, employment increased by 30%. The county's rate of growth in personal income between 1970 and 1977 was greater than that for the state as a whole. While median family income and per capita income tended to lag behind that for the state at large, this was attributed to the county's rapid population increase. According to Department of Taxation data, retail sales in the county increased by 145% between 1970 and 1978 compared to 141.4% statewide. Housing growth peaked in 1974, dropped after that, and began rising again in 1977. Demand was expected to increase as population grows.

In its application, FVB proposed to construct a 2,400 square-foot building in Royal Plaza Shopping Center. The building is designed to include three drive-in lanes. In addition to customary banking services, FVB will offer safe deposit boxes and introduce certain deposit and loan services currently not available or only marginally so at other banks in the area. FVB expects $2 million in deposits in three years but forecasts operating losses during the first two years.

At the close of FVB's evidence, the Commission called upon FRS&L, which had submitted no pre-filed data, to introduce evidence to support the allegations made in its protest. The sole witness called by FRS&L was John Salony who had been employed as chief executive officer some four weeks before the hearing. Salony testified that FRS&L had called in all its subscriptions and expected to open its office on July 3, 1980. Expressing concern about the current financial climate and FRS&L's ability to attract depositors, Salony said that FRS&L had decided to use a rented trailer instead of depleting its capital in the construction of the building originally planned, and to reduce its operating budget by half. Concerning FRS&L's interest in financing "shell" homes, a market in which FVB had been active, Salony said that the Veterans Administration and FHA will not participate in such loans,

and "if we . . . decide to make those type of loans, at least we would limit them very much." Asked what impact approval of FVB's application would have upon "your Association getting into business beginning in July of this year", Salony replied, "I think that's the last thing we need, is an extremely competitive, aggressive organization." "I think," he continued, "as a new savings and loan we just need . . . at least twelve months. And at the end of twelve months we can reassess our position again."

Aside from Salony's testimony, FRS&L offered no evidence to support the allegations made in its protest. In support of its claim of adverse impact, it relies on brief upon certain data developed during presentation of FVB's evidence. An investigative report prepared by the Bureau of Financial Institutions stated that addition of a new branch bank would decrease the average number of persons per office in Warren County to 2,625 compared to a statewide average of 2,978. The Bureau was of opinion that approval of FVB's application "could have an adverse impact" on FRS&L. This opinion was challenged by Dr. Ganas K. Rakes, an associate professor of finance at the University of Virginia. At the time the Bureau was investigating FVB's application, it issued a report on an application for a Front Royal branch filed by another bank. That application had projected total deposits of $4 million at the end of the third year of operations. Although the Bureau had recommended denial because the applicant was considered undercapitalized, it found that the proposed branch was "not expected to have a substantial impact" on FRS&L. Recalling this report, Rakes testified that "if four million . . . doesn't involve any injury . . . I would have to suggest that the two million dollar projection of First Virginia isn't going to harm them."

Rakes noted that deposits in banks in Warren County, which had grown by 190% between 1970 and 1978, decreased by 1.2% during the national "slump" of 1978 and 1979. Yet, throughout the same decade, deposits in First Federal continued to increase. Commenting on these facts, Rakes testified:

> The only clear trend is to the effect that the existing savings and loan association is doing very well. I conclude that it and the new savings and loan association will be in a superior position to continue to attract a relatively larger share of the deposit volume in the market. This view is supported by the existence of a large base of local stockholders for the new

institution and its identification as a locally owned institution. The proposed new branch should, therefore, not materially impact the new savings and loan association.

The Commission, summarizing the economic and demographic evidence and the interpretive testimony in comprehensive detail and applying the criteria prescribed in Code § 6.1-13(4) (incorporated by reference in § 6.1-39(a)), found that the public interest would be served by another branch bank serving Warren County. In the course of its analysis, the Commission considered the possibility of adverse impact on existing institutions. Observing that FRS&L enjoys certain competitive advantages, including local favor of a local institution, a desirable location, and higher authorized interest rates on certain deposits, the Commission concluded that "the addition of First Virginia's branch will not jeopardize the financial soundness of" FRS&L and that "the area both plan to serve is undergoing enough growth in population and business development to support both ventures profitably."

By order August 11, 1980, the Commission approved FVB's application. But, reaffirming its "commitment to exercise caution in permitting additional competition where a new institution is attempting to establish itself", the Commission postponed the effective date of authorization to February 2, 1981, "a date nine months after the hearing on this application." FRS&L opened its office in August 1980, and the Commission's order was suspended pending adjudication of FRS&L's appeal.

The gravamen of FRS&L's argument is that the Commission did not give due consideration to "possible adverse effects to existing institutions." Specifically, it says that the Commission "failed to apply or improperly applied" Code § 6.1-39(cl). This subsection, added to Title 6.1 by Acts 1978, c. 683, provides:

"In applying the test of 'public interest' specified herein, the Commission shall follow the policy of favoring smaller institutions unaffiliated with a bank holding company and of not encouraging undue concentration of resources."

In its opinion, the Commission expressed "doubt" that this subsection "was intended to afford protection to financial institutions other than banks." We believe the question the Commission raised is arguable. It plainly appears, however, that the doubt the Commission expressed was not a controlling factor in the decision it

reached, and we will reserve judgment until the question is raised on an appeal challenging a definitive ruling of the Commission.

■ The crucial standard in the statutory formula for determining whether a branch bank should be authorized is "public interest". The public interest is considered served if "advantages . . . outweigh possible adverse effects such as . . . diminished or unfair competition". Code §§ 6.1-39, -13(4). The Commission acknowledges on brief that, in applying the public-interest formula, "[i]t was . . . necessary . . . for the Commission to consider evidence concerning the competitive effect the proposed branch bank would have on the already-certificated Front Royal Savings."

We agree that the formula requires the Commission to consider whether authorization may jeopardize the financial soundness of existing savings and loan associations as well as that of existing banks. *See Ser. Nat. Bk.* v. *B. & H. Bk.,* 219 Va. 1031, 1033, 254 S.E.2d 77, 79 (1979); *Covington Bank* v. *State Bank,* 219 Va. 566, 572-573, 249 S.E.2d 163, 166-67 (1978); *Security Bank* v. *Schoolfield Bank,* 208 Va. 458, 462, 158 S.E.2d 743, 745-46 (1968). Ordinarily, competition in the financial market is constructive and productive; it can sometimes be destructive and unfair, and the public has a substantial interest in protecting all certificated financial institutions against ruinous competition. *See Peoples Finance* v. *Beneficial Finance,* 220 Va. 808, 813-14, 263 S.E.2d 59, 63 (1980).

■ Here, the Bureau of Financial Institutions reported that authorization of FVB's new branch "could have an adverse impact" on FRS&L. But FRS&L introduced no evidence to show the probability or extent of any such effect, and the Commission found the inferences FRS&L draws from FVB's evidence unpersuasive. Applying the statutory formula to the evidence as a whole, the Commission decided that "the advantages to the public accompanying the application far outweighed any possible adverse effect it might have" and that "the public interest will be served by the proposed branch office".

We cannot say that the Commission's decision was contrary to the evidence or without evidence to support it, *Old Dominion* v. *Colony Savings,* 219 Va. 586, 591, 249 S.E.2d 167, 171 (1978), and the order will be affirmed.

*Affirmed.*