## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Commonwealth of Virginia

v.

James Simone, Jr.

### Case No. (Crim.) 03-0986

BY JUDGE MARK S. DAVIS

October 10, 2003

This matter is before the Court on defendant's two motions to dismiss and motion *in limine*. The factual and procedural background of these motions, discussion of the issues, and conclusion are set forth below.

## I. *Factual and Procedural Background*

The defendant was indicted on May 1, 2003, on four counts of knowingly possessing sexually explicit visual material, which utilizes or has as a subject a person less than eighteen years of age, on or about June 29, 2002, in violation of Va. Code § 18.2-374.1:1, Virginia's child pornography possession statute. Count four is a first offense misdemeanor count, while counts one through three are second and subsequent offense felony counts.

The defendant requests that the Court dismiss the indictment on the grounds that the statute pursuant to which he was indicted is unconstitutional because it is facially vague and overbroad, thereby violating the free speech protections embodied in the Constitution of the United States and the Constitution of the Commonwealth of Virginia. As required by Va. Code § 19.2-266.2 and Rule 3A:9 of the Rules of the Virginia Supreme Court, the motion to dismiss on constitutional grounds was raised before the trial of this matter.

The defendant also requests that the Court grant his motion *in limine* to exclude any evidence that fails to prove beyond a reasonable doubt that the images at issue are those of actual children. The motion *in limine* was also raised before trial. Such a motion *in limine* is appropriately raised before trial where a ruling would narrow issues, prevent trial delay, avoid expense, and promote judicial efficiency, even where such a ruling represents a tentative evidentiary ruling requiring further proof of relevance at trial. *Harward v. Commonwealth*, 5 Va. App. 468, 474-75, 364 S.E.2d 511, 514 (1988).

The defendant further requests that the Court dismiss counts one through three, the second and subsequent offense counts, of the indictment because the images that are the subject of those counts cannot be distinguished temporally from the image which forms the basis of count four, the first offense count. For this reason, defendant asserts that the possession alleged in counts one through four should be treated as a "unit" possession.

Pursuant to Rule 3A:9(b)(3) authorizing oral motions to dismiss, the Court permits the defendant to proceed orally, on the record, with his motion to dismiss the indictment in its entirety and his motion to dismiss counts one through three. The Court finds that, as required by that rule, there is "good cause" to authorize the defendant to proceed orally on these motions based upon representations of defense counsel that a computer virus prevented him from printing the written motions and briefs in support prior to the hearing scheduled on such motions and based upon the fact that defense counsel presented the Court at oral argument with copies of cases in support of his arguments. The Court takes notice of the widely-reported fact that, on the

weekend prior to the hearing scheduled on defendant's motions, a computer virus infected and disabled many computer systems around the world. For similar reasons, pursuant to Rule 3A:9(b)(2), and the Court's inherent power to control its docket, the Court permits defendant to orally present his motion *in limine*. *Harward*, 5 Va. App. at 474, 363 S.E.2d at 514 (finding that to the extent any portion of a court's motion *in limine* ruling is tentative, conditional, or provisional, such ruling falls outside the purview of Rule 3A:9, which rule relieves a party of its obligation to renew its objection at trial). To the extent that any portion of the Court's ruling on defendant's motion *in limine* is tentative, conditional, or provisional, this Court considers the motion pursuant to its inherent authority to control its docket. *See Yarbrough v. Commonwealth*, 258 Va. 347, 361, 519 S.E.2d 602, 608 (1999) (recognizing inherent authority of circuit court to administer cases on its docket); *see also Riner v. Commonwealth*, 40 Va. App. 440, 453, 579 S.E.2d 671, 678 (2003) (recognizing courts' authority to control docket).

Oral argument on each of defendant's motions took place on September 2, 2003, and the Court made preliminary rulings from the bench, consistent with this written Opinion and Order, on September 3, 2003, reserving the right to issue this written Opinion and Order. At the same hearing, the Court granted the motion of the Commonwealth to continue the trial of this matter to October 27, 2003.

## II. *Discussion*

The Court first addresses a stipulation entered into between the Commonwealth and the defendant regarding the version of the child pornography statute that applies in this case. The Court will then address the defendant's two motions to dismiss and his motion *in limine*.

### A. *Stipulation to Applicable Statute*

The Virginia legislature amended the Virginia statute prohibiting possession of child pornography, Va. Code § 18.2-374.1:1, during its 2003 session. At oral argument on these motions, counsel for the defendant and the Commonwealth stipulated that the applicable version of this statute is that in existence at the time of the crimes alleged, June 29, 2002. The Court accepts this stipulation, *cf. Gudnason v. Life Ins. Co. of North Am.*, 231 Va. 197, 204, 343 S.E.2d 54, 58-59 (1986), and notes that it is consistent with the statutory mandate embodied in Va. Code § 1-16 "that no new law shall be construed to repeal a former law, as to any offense committed against the former law." The stipulation is also consistent with the cases construing that code section. The

Virginia Supreme Court applied Va. Code § 1-16 in *Ruplenas v. Commonwealth*, 221 Va. 972, 975-78, 275 S.E.2d 628, 630-32 (1981), holding that the criminal penalty in existence at the time of an offense should be applied unless the Commonwealth first elects to proceed under the new statute and obtains consent of the defendant to do so. Accordingly, the Court will apply the statutory version of Va. Code § 18.2-374.1:1 that was in effect on June 29, 2002, rather than the current version of the statute with the 2003 amendments modifying the penalties.

## B. *Motion to Dismiss on Constitutionality of Statute*

The defendant's first motion to dismiss is based upon his argument that the prohibition on possession of child pornography contained in Va. Code § 18.2-374.1:1 and the statute defining child pornography, Va. Code § 18.2-374.1, are unconstitutionally vague and overbroad and therefore violate the U.S. and Virginia Constitutions' prohibitions against the making of any law abridging the freedom of speech.

### 1. *Standing*

Before the Court can address the defendant's challenge, he must have standing. The fundamental rule of standing is that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S. Ct. 2908, 2915, 37 L. Ed. 2d 830, 839 (1973). However, overbreadth and vagueness challenges are exceptions to this general rule of standing. Where a "claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Secretary of State v. J. H. Munson Co.*, 467 U.S. 947, 957, 104 S. Ct. 2839, 2847, 81 L. Ed. 2d 786, 796 (1984); *Perkins v. Commonwealth*, 12 Va. App. 7, 11-12, 402 S.E.2d 229, 232 (1991) (recognizing this doctrine). Such overbreadth challenges have been described by the U.S. Supreme Court as "strong medicine," *Broadrick*, 413 U.S. at 613, 93 S. Ct. at 2916, 37 L. Ed. 2d at 841, because they involve the facial invalidation of an entire statute and because it permits individuals standing to raise the claims of others not before the court. Therefore, an individual who might otherwise be constitutionally punished under an applicable section of the statute is allowed to go free

because a separate provision is invalidated. Chemerinsky, *Constitutional Law* 924 (2001). Similarly, a facial attack on the grounds of vagueness may proceed even though the litigant's own speech may be unprotected. *Perkins*, 12 Va. App. at 12, 402 S.E.2d at 232. The Court reads defendant's motion to dismiss as a facial attack on the statute based upon the specific arguments addressed here. Accordingly, even if the defendant's conduct proves to be constitutionally proscribed, the statute may be challenged.[1]

## 2. *Constitutional Road to Prohibiting Possession*

Defendant's challenge to the statute is based upon the free speech protections of the U.S. and Virginia Constitutions. In reviewing the free speech protections in those constitutions, we look to the language of the words and phrases used in the Constitutions. *Graham v. Commonwealth*, 11 Va. App. 133, 137, 397 S.E.2d 270, 272 (1990).

The First Amendment to the U.S. Constitution provides, in pertinent part, that "Congress shall make no law ... abridging the freedom of speech. . . ." U.S. Const., amend. I. While the text of the amendment specifically states that it applies to actions of Congress, the U.S. Supreme Court has held that the Due Process clause of the Fourteenth Amendment[2] incorporates many of the substantive protections of the first ten amendments to the U.S. Constitution, otherwise known as the Bill of Rights, and applies such protections to the individual states. The modern test to determine whether a guarantee extended by the Bill of Rights also applies to the individual states is whether the clause in question "is fundamental to the American scheme of justice. . . ." *Duran v. Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 1447, 20 L. Ed. 2d 491, 496 (1968). Once a right is incorporated, it is applied to limit the states in the same way that it is applied to limit the actions of Congress. *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Since they are fundamental to the American scheme of justice, the free speech protections of the First

---

[1] In *Virginia v. Hicks*, 123 S. Ct. 2191, 2197, 156 L. Ed. 2d 148, 158 (2003), the U.S. Supreme Court refused to consider Virginia's argument that restrictions should be placed on the use of overbreadth standing by limiting the availability of facial overbreadth challenges to those whose own conduct involved some type of expressive activity. The U.S. Supreme Court left that question to the Virginia courts on remand and refused to consider the argument because "[s]tate courts are not bound by the limitations of a case or controversy or other federal rules

of justiciability even when they address issues of federal law." *Id.* No similar argument is here made, nor has the Virginia Supreme Court issued an Opinion on remand.

[2] The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law. . . ." U.S. Const., amend. XIV.

Amendment to the U.S. Constitution are among those protections specifically extended to the laws of the states. *Gitlow v. New York*, 268 U.S. 652, 666, 45 S. Ct. 625, 630, 69 L. Ed. 1138, 1145 (1925).

The Virginia Constitution provides, in pertinent part, that "the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech. . . ." Va. Const., art. I, § 12. The free speech protections provided in this section of the Virginia Constitution are co-extensive with those provided in the U.S. Constitution. *Bennefield v. Commonwealth*, 21 Va. App. 729, 739-40, 467 S.E.2d 306, 311 (1996). Accordingly, the U.S. Constitution and the Virginia Constitution provide the same levels of protection for individual free speech rights, and because the First Amendment is applicable to state laws, the decisions of the U.S. Supreme Court on substantive First Amendment issues have immediate and binding application in Virginia courts.

In order to examine Virginia's statutory prohibition on possession of child pornography against the backdrop of constitutional free speech protections, and since the protections of the U.S. and Virginia Constitutions are co-extensive, it is necessary to examine the First Amendment free speech jurisprudence of the U.S. Supreme Court and the Virginia Supreme Court.

(a) *Historical Background to Free Speech Protections*

Examining free speech rights in the context of child pornography, we start with the proposition that our "democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." *Prince v. Massachusetts*, 321 U.S. 158, 168, 64 S. Ct. 438, 443, 88 L. Ed. 645, 654 (1944). However, our democratic society also values freedom of speech and places great weight on its protection. Our interest in protecting the nation's children sometimes clashes with our interest in protecting free speech. A review of the historical background to our free speech protections assists in framing this clash of the two interests.

The historical background to the free speech protections embodied in our Constitutions "undoubtedly was a reaction against the suppression of speech and of the press that existed in English society." Erwin Chemerinsky, *Constitutional Law* 894 (2001). Until 1694 an elaborate system of licensing existed in England, and no publication was permitted without a government-granted license. When Blackstone wrote his foundational commentaries on the

law, he noted that "[t]he liberty of the press consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. ... [T]o subject the press to the restrictive power of a licenser ... is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government." 4 William Blackstone, *Commentaries on the Laws of England*, 151-52 (1769). Though such "prior restraint" of publication was abandoned a century before the adoption of the First Amendment, the barrier to licensing is accepted as the major thrust behind the First Amendment's free speech protections. *Schenck v. United States*, 249 U.S. 47, 51, 39 S. Ct. 247, 249, 63 L. Ed. 470, 473 (1919); Kathleen M. Sullivan, *First Amendment Law* 2-3 (1999). Speech in England was also restricted by the law of seditious libel, making criticism of the government a crime. Commentators have also suggested that "the First Amendment was ... intended to wipe out the common law of sedition, and make further prosecution for criticism of the government, without any incitement to law-breaking, forever impossible in the United States of America." Zechariah Chaffee, Jr., *Free Speech in the United States* (1941). It is also telling that Justice Joseph Story, in his commentaries on the U.S. Constitution, described the First Amendment free speech clause ("Congress shall make no law abridging the freedom of speech or of the press") as a clause addressing "liberty of the press," and confines virtually his entire commentary on the issue to press rights. Joseph Story, *Commentaries on the Constitution of the United States*, § 1880-95 (1891).

In Virginia, the original Constitution, as drafted in 1776, only addressed freedom of the press, not speech. 1 A. E. Dick Howard, *Commentaries on the Constitution of Virginia* 249-51 (1974). This seems to confirm the view expressed above that the main thrust of the First Amendment was concern about prior restraint of the press. Freedom of speech was specifically written into the Virginia Constitution in 1830. *Id.* In the 1870 version of the Virginia Constitution, a second clause was added, providing that every man should be responsible for the abuse of such rights. This addition "expressed the Blackstonian notion that a man must not be subject to prior restraint[,] *but if* he ventures beyond constitutional protection, he must 'take the consequence of his own temerity'." *Id.* at 252 (emphasis added).

(b) *Federal Case Law Development*

While the free speech protections provided by the U.S. and Virginia Constitutions are co-extensive, our analysis of their protections begins with

their plain language, consistent with well-established constitutional construction principles. The plain language of the First Amendment to the U.S. Constitution provides that the government shall make no law abridging the freedom of speech. The common meaning of abridge is to cut short or abbreviate. *Webster's II New Collegiate Dictionary* 2001. The plain language of the Virginia Constitution provides that the government shall not pass any law abridging the freedom of speech because free speech is a bulwark of liberty and can never be restrained, though citizens must be responsible for the abuse of such free speech. The plain language of these provisions appears to encompass expression of ideas, and the U.S. Supreme Court appears to have long read the freedom of speech guaranteed by the First Amendment to be speech about ideas. For example, in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 769, 86 L. Ed. 2d 1031, 1035 (1942), the Court said:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words − those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of *ideas*, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

(Emphasis added.) However, with the passage of time, the Supreme Court began to include, within the ambit of constitutional free speech protections, more than so-called "pure speech."

Forms of speech and expression that include more than natural oral or written expression have been referred to as "conduct," and "speech plus" − a form of behavior in which speech and conduct elements are intertwined, and free speech protections have been extended to these areas. *E.g., Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 2545, 105 L. Ed. 2d 342, 360 (1989) (finding criminalization of flag-burning unconstitutional and noting "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"), *Cohen v. California*, 403 U.S. 15, 26, 91 S. Ct. 1780, 1789, 29 L. Ed. 2d 284, 295 (1971) (prohibiting disorderly conduct conviction of man who wore jacket bearing words "f--- the draft," without the ellipsis, in courthouse corridor). Therefore,

pursuant to rulings of the U.S. Supreme Court, the "speech" protected by the Constitution now includes non-verbal self-expression such as wearing clothes bearing language and burning items that bear representative characteristics. In the same way, speech protections asserted in the context of prosecutions for possession of child pornography are based upon assertions of "conduct" rather than "pure speech." *See State v. Young*, 37 Ohio St. 3d 249, 251-52, 525 N.E.2d 1363, 1367 (1988) (describing possession of child pornography as "conduct" versus "pure speech"), *rev'd on other grounds, Osborne v. Ohio*, 495 U.S. 103, 112, 110 S. Ct. 1691, 1697, 109 L. Ed. 2d 98, 111 (1990) (including possession with other "conduct" speech). The reach of constitutional free speech protections was recently described by the U.S. Supreme Court in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002), as follows: "[a]s a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear," though it has limits. *Ashcroft*, 535 U.S. at 245, 122 S. Ct. at 1399, 152 L. Ed. 2d at 418.

The limits imposed on constitutional free speech protections are defined by the governmental purpose in restricting such speech. All government actions must at least have a "rational basis," requiring that the law be rationally related to a legitimate governmental purpose. Chemerinsky, *supra* 969, 528; *Mahan v. National Conservative Political Action Committee*, 227 Va. 330, 336, 315 S.E.2d 829, 833 (1984). However, when reviewing certain government actions, such as action affecting free speech protections, courts apply a heightened level of scrutiny. The Supreme Court applies strict scrutiny to content-based laws impacting speech, while intermediate scrutiny is applied to content-neutral laws impacting speech. Chemerinsky, *supra*, 908; *see Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S. Ct. 948, 955, 74 L. Ed. 2d 794, 804 (1983). Because the Virginia child pornography statute clearly regulates certain items based upon their content, thereby utilizing a subject matter restriction, strict scrutiny must be applied in reviewing such a statute.

Since the U.S. "Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere," *Ashcroft*, 535 U.S. at 244, 122 S. Ct. at 1399, 12 L. Ed. 2d at 417, strict scrutiny requires a court to find that the restriction of speech is justified by a compelling governmental interest and is narrowly tailored to achieve that interest, rather than being vague and overbroad. *Illinois v. Alexander*, 204 Ill. 2d 472, 476, 791 N.E.2d 506, 509 (2003), *cf. Mahan*, 227 Va. 336, 315 S.E.2d at 832. The U.S. Supreme Court has held that content-based restrictions on certain categories of speech satisfy the strict scrutiny standard.

As the Illinois Supreme Court recently stated in *Alexander*, the "First Amendment's 'vast and privileged sphere' (*Ashcroft*, 535 U.S. at 244, 152 L. Ed. 2d at 417, 122 S. Ct. at 1399) does not extend to incitement (*see Brandenburg v. Ohio*, 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969)), fighting words (*see Chaplinsky v. New Hampshire*, 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942)), defamation (*see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 86 L. Ed. 2d 593, 105 S. Ct. 2939 (1985)), or obscenity (*see Miller v. California*, 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973))." *Alexander*, 204 Ill. 2d at 476-7, 791 N.E.2d at 509-10.

While the issue before the Court involves a child pornography statute rather than an obscenity statute, the issue of child pornography and obscenity are intricately intertwined from both a public policy, legislative, and judicial standpoint. Furthermore, the statutory scheme by which the Commonwealth of Virginia seeks to address child pornography and obscenity reflects an effort to cover various issues that overlap, as well as an effort not to restrict certain protected areas of speech. Because of this relationship and because the statutory construction rule of *in pari materia* requires that statutes relating to the same subject should be read, construed, and applied together where there is any lack of clarity, the Court will review the Virginia obscenity and child pornography statutes below. Accordingly, in order to understand the relationship between Virginia's obscenity and child pornography statutes and to understand the overbreadth challenge to the child pornography statute, the Court will review the development of obscenity jurisprudence and child pornography jurisprudence.

As noted above, in the *Chaplinsky* opinion, Justice Murphy explained that, among other limited classes of speech, the prevention and punishment of obscenity had never been thought to raise any Constitutional problem. But he was not directly addressing a question of obscenity in that case, he was addressing a conviction under a "fighting words" statute. In *Roth v. United States*, 354 U.S. 476, 485, 77 S. Ct. 1304, 1309, 1 L. Ed. 2d 1498, 1507 (1957), the Supreme Court directly held that obscenity is a category of speech unprotected by the free speech protections of the First Amendment. The Court stated that sex and obscenity are not synonymous and that obscene material is material which deals with sex in a manner appealing to prurient interest, i.e. material having a tendency to excite lustful thoughts. *Id.* Difficulty with definition of obscenity is perhaps best remembered in the statement of Justice Potter Stewart, "I shall not today attempt further to define the kinds of material I understand to be embraced within the shorthand description [of obscenity]; and perhaps I could never succeed in intelligibly doing so. But I know it when

I see it, and the motion picture involved in this case is not that." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 1683, 12 L. Ed. 2d 793, 803 (1964).

The Supreme Court re-affirmed that obscene material is not protected by the First Amendment in *Paris Adult Theatre v. Slaton*, 413 U.S. 49, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973), and it then formulated, in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), the definition of obscenity that is used in federal and state courts throughout the country to this day. In *Miller*, the Supreme Court reviewed the constitutionality of a California statute prohibiting distribution of obscene material. *Miller*, 413 U.S. at 24-25, 93 S. Ct. at 2615, 37 L. Ed. 2d at 431. The *Miller* Court established a three-pronged test for determining whether material is obscene. In order to find material obscene, it must first be established that the "average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest." *Id.* Second, it must be established that the material depicts or describes "in a patently offensive way, sexual conduct specifically defined by the applicable state law." *Id.* at 24-26, 93 S. Ct. at 2615-16, 32 L. Ed. 2d at 431-33. Third, it must be established that "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.*

In *New York v. Ferber*, 458 U.S. 747, 764, 102 S. Ct. 3348, 3358, 73 L. Ed. 2d 1113, 1127 (1982), the Supreme Court added child pornography as another category of speech outside the protection of the First Amendment, regardless of whether it met the test for obscenity. The *Ferber* Court reviewed New York statutes that made it a crime for a person knowingly to promote sexual performances by children under the age of sixteen by distributing material which depicts such performances, even though the material itself was not necessarily obscene. *Id.* at 756, 102 S. Ct. at 3354, 73 L. Ed. 2d at 1122. The Supreme Court concluded that "[l]ike obscenity statutes, laws directed at the dissemination of child pornography run the risk of suppressing protected expression by allowing the hand of the censor to become unduly heavy" … "however, we are persuaded that the States are entitled to greater leeway in the regulation of pornographic depictions of children." *Id.*

In finding that such content-based restrictions on child pornography satisfy strict scrutiny analysis, the Supreme Court articulated five basic reasons for having reached this conclusion. First, the state's interest in safeguarding the physical and psychological well being of a minor is compelling since the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. *Id.* at 756-57, 102 S. Ct. at 3354, 73 L. Ed. 2d at 1122. Second, the prohibition on the distribution of films and photos depicting such activities is closely related to this

compelling governmental interest in two ways: one, materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation; second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled. As the *Ashcroft* Court later recognized, "[u]nder either of these rationale, the speech had what the *Ferber* Court in effect held was a proximate link to the crime from which it came." *Ashcroft*, 535 U.S. at 250, 122 S. Ct. at 1401, 152 L. Ed. 2d at 420-21.

Third, the *Ferber* Court held that the advertising and selling of the material encourages the evil by supplying an economic motive. Fourth, the value of permitting live performances and photographic reproduction of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*. The Supreme Court also noted that "if it were necessary for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized" and "[s]imulation outside of the prohibition of the statute could provide another alternative." *Ferber*, 458 U.S. at 763, 102 S. Ct. at 3357, 73 L. Ed. 2d at 1127. Fifth, the classification of child pornography as outside First Amendment protection is consistent with earlier precedent and justified by the need to protect the welfare of the child. The Supreme Court here noted that "the nature of the harm to be combated requires that the state offense be limited to works that *visually* depict sexual conduct by children below a specified age." *Ferber*, 458 U.S. at 764, 102 S. Ct. at 3358, 73 L. Ed. 2d at 1127.[3]

As the U.S. Supreme Court developed the application of the obscenity standard, it also addressed possession of obscene material. The *Miller* test applied to "distribution" of obscene material, not "possession;" and *Ferber* applied to distribution of material depicting sexual performances by children, not possession. In *Stanley v. Georgia*, 394 U.S. 557, 559, 89 S. Ct. 1243, 1245, 22 L. Ed. 2d 542, 546 (1969), the Supreme Court held that the "mere private possession of obscene matter cannot constitutionally be made a crime," reasoning that the right of speech also protects the right to receive. However, after the ruling in *Ferber*, the Court refused to extend the *Stanley* ruling to the possession of *child pornography*, allowing *Stanley* to stand but applying it

---

[3] The U.S. Supreme Court did not attempt to define child pornography in *Ferber*. It simply upheld the definition contained in the New York law. The Court also failed to address the question of whether child pornography can be banned if it has serious socially redeeming value. *See Massachusetts v. Oakes*, 491 U.S. 576 (1989) (court expressed concern about overbreadth of state child pornography law, but did not resolve these issues because statute was changed in the midst of litigation). There is no such claim in the present case.

narrowly. Chemerinsky, *supra* 1034-35; *see United States v. Reidel*, 402 U.S. 351, 354, 91 S. Ct. 1410, 1412, 28 L. Ed. 2d 813, 816-17 (1971) (refusing to extend *Stanley* to protect the receipt of obscene materials in violation of federal law prohibiting shipment of such materials).

The obscenity test established in *Miller* asked whether the images appeal to the prurient interest of the average person. That test bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the image. It is theoretically possible that a child could be physically or psychologically harmed in the production of an objectionable image but that such image might not be considered obscene under *Miller* because such image did not appeal to the prurient interest of the average person. Therefore, in order to protect children from being used for production of objectionable images that may not meet the obscenity standard, a new standard was necessary.

In *Osborne v. Ohio*, 495 U.S. 103, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990), a defendant was convicted of violating an Ohio statute prohibiting any person from possessing or viewing any material or performance showing a minor who is not his child or ward in a state of nudity, unless (a) the material or performance is presented for a bona fide purpose by or to a person having a proper interest therein, or (b) the possessor knows that the minor's parents or guardian has consented in writing to such photographing or use of the minor. The defendant was arrested after police found photographs in his home depicting a nude male adolescent posed in a sexually explicit position. The defendant contended that the First Amendment's free speech protections prohibit the States from proscribing the private possession of child pornography. The Supreme Court acknowledged its ruling in *Stanley* but stated that, in the *Stanley* case, the state of Georgia primarily sought to proscribe the private possession of obscenity because it was concerned that obscenity would poison the minds of its viewers. *Id.* at 108, 110 S. Ct. at 1695, 109 L. Ed. 2d at 108-09. In *Osborne*, on the other hand, the "[s]tate does not rely on a paternalistic interest in regulating Osborne's mind. Rather, Ohio has enacted [the statute] in order to protect the victims of child pornography; it hopes to destroy a market for the exploitative use of children." *Id.* at 109, 110 S. Ct. at 1696, 109 L. Ed. 2d at 109. The same interests in eliminating the entire chain of distribution that justified the result in *Ferber* also justified eliminating the demand by criminalizing possession of child pornography.

The Supreme Court held that Ohio may constitutionally proscribe the possession and viewing of child pornography. The Court noted that the law on its face barred the possession of nude photographs and although simple

depictions of nudity cannot be proscribed, Justice White relied on the fact that the state court had limited the reach of the law to cases in which "such nudity constitutes a lewd exhibition or involved a graphic focus on the genitals, where the person depicted is neither the child nor the ward of the person charged." *Id.* at 113, 110 S. Ct. at 1698, 109 L. Ed. 2d at 112. Reading these cases together, it appears clear that, as of 2002, the U.S. Supreme Court's jurisprudence prevented the government from prohibiting or punishing the private possession of obscene material, though it may outlaw the private possession of child pornography.

### (c) *Effect of Ashcroft v. Free Speech Coalition*

The next major development in the Supreme Court's child pornography jurisprudence on possession came last year in *Ashcroft*. Defendant argues that the *Ashcroft* decision compels this Court to find the Virginia child pornography statute facially invalid and unconstitutional on the grounds that it violates the free speech provisions of the U.S. and Virginia Constitutions.

In *Ashcroft*, the Supreme Court was faced with a challenge to the Child Pornography Prevention Act of 1996 (CPPA), which expanded the federal prohibition on child pornography to include not only pornographic images made using actual children, 18 U.S.C. § 2256(8)(A), but also "any visual depiction, including any photography, film, video, picture, or computer or computer-generated image or picture" that "is, *or appears to be,* of a minor engaging in sexually explicit conduct," 18 U.S.C. § 2256(8)(B), and any sexually explicit image that is "advertised, promoted, presented, described, or distributed in such a manner that *conveys the impression*" it depicts "a minor engaging in sexually explicit conduct," 18 U.S.C. § 2256(8)(D) (emphasis added). The CPPA therefore banned a range of sexually explicit images sometimes called "virtual child pornography,"[4] that appear to depict minors but were produced by means other than using real children, such as through the use of youthful-looking adults or computer-imaging technology. Justice Kennedy described the issue in *Ashcroft* as "whether the CPPA is constitutional where it proscribes a significant universe of speech that is neither obscene under *Miller* nor child pornography under *Ferber*." *Ashcroft*, 535 U.S. at 240, 122 S. Ct. at 1396, 152 L. Ed. 2d at 414.[5]

---

[4] This Court prefers to refer to such images, which appear to depict minors but are produced by means other than using actual children, as "computer-generated virtual child pornography" in order to distinguish such images from images of real children that have been digitally modified (morphed).

[5] The *Ashcroft* Opinion appears to leave for another day the question whether some computer-generated virtual child pornography can be "obscene."

The U.S. government conceded in *Ashcroft* that computer-generated virtual child pornography images do not harm any children in the production process but argued that Congress had concluded that "the materials threaten children in other, less direct ways." *Id.* The government also argued that computer-generated virtual child pornography "whets the appetites of pedophiles and encourages them to engage in illegal conduct," *Id.* at 253, 122 S. Ct. at 1403, 152 L. Ed. 2d 422, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children. The government further argued that, with technological advances, it will become more difficult, if not impossible, to distinguish between computer-generated virtual images and images utilizing real children, thereby making it easier to evade prosecution. *Id.* at 254, 122 S. Ct. at 1404, 152 L. Ed. 2d at 423-24.

In responding to the government's argument, the *Ashcroft* Court "reasoned that the governmental interest in protecting children did not extend to the use of images in the production of which real children had not been involved." *Id.* While the U.S. Government asserted in *Ashcroft* (as noted above) that production, possession, and viewing of virtual images, in which real children were not involved, can lead to actual instances of child abuse, the Supreme Court held that the causal link in such instances is contingent and indirect. The Court held that the alleged harm in such cases does not necessarily follow from the speech but depends upon some unquantified potential for subsequent criminal acts. *Ashcroft*, 535 U.S. at 250-51, 122 S. Ct. at 1402, 152 L. Ed. 2d at 421-22.[6] The *Ashcroft* Court concluded "that certain definitional sections of the Child Pornography Prevention Act of 1996 (CPPA) [citation omitted] to the extent they criminalized the possession or distribution of virtual images were overly broad in their abridgments of freedoms protected by the First Amendment to the United States Constitution and, hence, unconstitutional." *See State of New Jersey v. May*, 829 A.2d 1106,

---

[6] The *Ashcroft* Court intimated that it might "have been swayed by a more fully developed argument incorporating the *Brandenburg* analysis and more evidence of a closer link between [computer-generated] virtual child pornography and harm to real children." Justin Leach, *Reacting to Ashcroft v. Free Speech Coalition and the Burial of the CPPA: An Argument to Regulate Digital Child Pornography Because It Incites Lawless Action*, 5 Vand. J. Ent. L. & Prac. 114, 120-24 (2003); *Ashcroft*, 535 U.S. at 253, 122 S. Ct. at 1403. Therefore, to the extent it is argued that computer-generated virtual images or morphed images of real children are not close enough to the *Osborne* exploitation test, it may be that the U.S. Supreme Court left the door open to considering an argument (with appropriate supporting evidence) that computer-generated virtual images *or* morphed images based in part upon real children incite or produce imminent lawless action harming children and should be prohibited.

1115-16 (N.J. Super. 2003). The *Ashcroft* Court said that the CPPA covered materials not involving actual children, beyond the categories recognized in *Miller* and *Ferber*, thereby violating the freedom to engage in a substantial amount of lawful speech.

As discussed below, the Supreme Court in *Ashcroft* "did not consider issues bearing on the process known as 'computer morphing,' *i.e.*, 'altering innocent pictures of real children so that the children appear to be engaged in sexual activity'." *May*, 829 A.2d at 1115-16 (citing *Ashcroft*, 535 U.S. at 242, 122 S. Ct. at 1397, 152 L. Ed. 2d at 416). One of the Supreme Court's main concerns in *Ashcroft* was that the CPPA prohibited the possession of images if the person depicted "appeared to be" a minor, not just if the person actually was a minor. In essence, the Court held that, if there is no child being harmed in a production process, there is no child in need of protection.

### (d) *Virginia Case Law Development*

In Virginia, the Courts also developed a parallel jurisprudence addressing obscenity and child pornography issues. In *Price v. Commonwealth*, 214 Va. 490, 201 S.E.2d 798 (1974) the Virginia Supreme Court considered a challenge to Virginia's obscenity statute, and in doing so the Court filled in holes left by the U.S. Supreme Court's *Miller* decision. The *Miller* Court upheld the state statute, rebuffing claims it was vague and overbroad. While *Miller* had said national standards were not to be applied in obscenity prosecutions without stating whether state or local standards were to apply, the Virginia Supreme Court held that local standards were permissible. *Id.*

Prior to the issuance of the *Ferber* decision, the Virginia Supreme Court considered the constitutionality of the then-existing Virginia child pornography statute. In *Freeman v. Commonwealth*, 223 Va. 301, 288 S.E.2d 461 (1982), the Virginia Supreme Court considered a defendant's challenge to his conviction for producing sexually explicit visual material of a five year old girl. Freeman contended "that the statute, read as a whole, is unconstitutionally overbroad and vague." *Id.* at 305, 288 S.E.2d at 463. The Court reviewed the purpose for enacting the statute, noting that "[w]hatever the photographers' motivations, and however great the illicit profit involved, society's chief concern is the injury inflicted upon its children in the process of production and sale." *Id.* The Court went on to note that "lawmakers began searching for new ways of dealing with a new threat to children," and that the Virginia "General Assembly attacked the problem at its roots and in all its branches." *Id.* at 307, 288 S.E.2d at 464-65. The Court stated that the version of Va. Code § 18.2-374.1 at issue was enacted near the end of the 1970s and

focused upon child pornography, relating to "sexually explicit visual material" which utilizes a subject less than eighteen years of age.

As described by the Court, the then-existing statute "criminalize[d] the distribution of such material as well as its production."[7] *Id.* The Court concluded that "reading the statute as a whole in light of the public concern which gave it birth, we believe the paramount legislative goal was to protect children from the harm they suffer when they are induced to become models for such materials, irrespective of the motive or intent of the offender." *Id.* at 309, 288 S.E.2d at 465. The Virginia Supreme Court stated that children are not always aware of the dangers to which they are exposed and "the state has a compelling interest, one central to its right to survive, in protecting its children from treatment it determines is physically or psychologically injurious to youth." *Id.* The Court noted that the production and distribution of child pornography is such "treatment" and the statute was intended to further the state's interest by punishing and deterring such treatment. The Court found that "[w]hatever restriction the distribution penalties impose upon the First Amendment rights of adults who want to sell or view child pornography is merely an effect incidental to the achievement of the goal that statute pursues." *Id.* Accordingly, the Virginia Supreme Court held that the statute prohibiting production and distribution of child pornography was not unconstitutionally overbroad. However, the defendant in that case also claimed that the statute was unconstitutionally vague, so as to offend the Due Process clause of the Fourteenth Amendment to the U.S. Constitution, because its words and phrases provided inadequate notice to the public of what conduct is prohibited. The Court also rejected Freeman's vagueness challenge to the constitutionality of the statute, finding the statute provided sufficient notice.

The Virginia Court of Appeals subsequently addressed the constitutionality of the Virginia child pornography statute in *Foster v. Commonwealth*, 6 Va. App. 313, 369 S.E.2d 688 (1988), where a defendant was convicted of violating the then-existing Virginia statute by, among other things, taking photographs of children in various stages of undress. Foster challenged that section of the child pornography statute that defined "sexually explicit visual material," alleging that the statute was unconstitutionally vague and overbroad. *Id.* at 324, 369 S.E.2d at 695. After severing that portion of the

---

[7] The U.S. Supreme Court held that the State of Ohio could constitutionally proscribe the possession and viewing of child pornography in its 1990 decision in *Osborne*, 495 U.S. at 109, 110 S. Ct. at 1696, 109 L. Ed. 2d 110. The Virginia General Assembly, perhaps not coincidentally, first criminalized the "possession" of child pornography in 1992 with the enactment of Va. Code § 18.2-374.1:1, though production and distribution were already prohibited.

Virginia statute defining what is "obscene for children," the Court of Appeals found that the statute met all of the requirements of *Ferber*. The Court of Appeals also considered the scienter requirement of the statute and found it in compliance with the requirements of *Ferber*. Accordingly, the *Foster* Court concluded that the statutory provisions at issue were not "unconstitutional for vagueness or overbreadth." *Id.* at 326, 369 S.E.2d at 696. The Court of Appeals did not consider the issue of possession of child pornography since the statute criminalizing possession of such materials was not enacted until four years later in 1992.

### 3. *Challenge to Virginia Child Pornography Statute*

We now turn our attention to the impact of these federal and state case law developments on the Virginia statute at issue.

### (a) *Vagueness and Overbreadth Standards*

The defendant asserts a facial challenge to the child pornography statute under the vagueness and overbreadth doctrines. As Justice Kinser recently observed:

> A facial challenge to a statute … can proceed under two different doctrines. "First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep'." *City of Chicago v. Morales*, 527 U.S. 41, 52, 144 L. Ed. 2d 67, 119 S. Ct. 1849 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973)). Under the second doctrine, even if a statute is not overbroad (i.e., it "does not reach a substantial amount of constitutionally protected conduct"), "it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 358, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983).

*Commonwealth v. Hicks*, 264 Va. 48, 61, 563 S.E.2d 674, 680 (2002), *rev'd on other grounds*, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003).

A law is unconstitutionally vague if a reasonable person is unable to determine what speech is permitted and what speech is prohibited. *See, e.g.*, *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127, 70 L.

Ed. 322, 328 (1926) (holding that a law is unconstitutionally vague when people "of common intelligence must necessarily guess at its meaning"). Justice O'Connor has noted that "[t]he more important aspect of the vagueness doctrine is not actual notice, but the other principle element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 1858, 75 L. Ed. 2d 903, 909 (1963). While complete exactness is seldom possible in drafting a statute, the Supreme Court has made it clear that greater precision is required when laws regulate speech, and such statutes will be invalidated if a court concludes they provide inadequate notice as to what speech is prohibited and what is allowed. Chemerinsky, *supra*, 921. While all laws regulating conduct can be challenged under the due process vagueness doctrine, courts are particularly careful in reviewing vague laws restricting speech out of concern that they will chill constitutionally protected speech. *Broadrick*, 413 U.S. at 629, 93 S. Ct. at 2925, 37 L. Ed. 2d at 850.(noting freedom of speech is "delicate and vulnerable, as well as supremely precious in our society … [and] the threat of sanctions may deter their exercise almost as potently as the actual application of sanctions"); *Perkins*, 12 Va. App. 7, 16, 402 S.E.2d 229, 234 (1991) (Fourteenth Amendment Due Process clause insists that laws give the person notice of what is prohibited and provide explicit standards). The void-for-vagueness doctrine has been described as a particularly powerful tool in First Amendment litigation because it allows facial challenges to laws even by those whose speech otherwise would be unprotected by the First Amendment. Chemerinsky, *supra*.

"A law is unconstitutionally overbroad if it regulates substantially more speech than the Constitution allows to be regulated and persons to whom the law constitutionally can be applied can argue that it would be unconstitutional as applied to others." Chemerinsky, *supra* 921; *see Hicks*, 264 Va. at 56-59, 563 S.E.2d at 678-80. In an area where the government is free to regulate speech, such as obscenity, a law that regulates much more expression than the Constitution allows to be restricted will be declared unconstitutional on overbreadth grounds. *Id*. Complete exactness is seldom possible in drafting a statute. Therefore, the Supreme Court does not declare laws unconstitutional on their face unless the overbreadth is "substantial," though particular applications of a law can be declared unconstitutional if specifically challenged. *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus*, 482 U.S. 569, 574, 107 S. Ct. 2568, 2572, 96 L. Ed. 2d 500, 507 (1987); *Ferber*,

458 U.S. at 769, 102 S. Ct. at 3361, 73 L. Ed. 2d at 1130 (acknowledging child pornography law could be applied to material with serious literary, scientific, or education value, but upholding statute because such applications would not amount to more than a tiny fraction of the materials within the statute's reach). Additionally, the Supreme Court has said that it will avoid invalidating laws by allowing courts to construe statutes narrowly and thus avoid overbreadth. *Osborne*, 495 U.S. at 119, 110 S. Ct. at 1701, 109 L. Ed. 2d at 116 (reading into a statute prohibiting possession of non-lewd nude photographs of minors, which is protected speech, additional requirement that such photographs constitute a lewd exhibition or involve graphic focus on genitals, and upholding statute with such narrowing construction); *Perkins*, 12 Va. App. at 14, 402 S.E.2d at 233.

The "void-for-vagueness" and "overbreadth" doctrines in the Constitutional free speech arena are frequently intertwined. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S. Ct. 2176, 2181, 68 L. Ed. 2d 671, 679 (1981) (Justice White, writing for the Court, noting that "[b]ecause overbroad laws, like vague ones, deter privileged activit[ies], our cases firmly establish appellant's standing to raise an overbreadth challenge"). These challenges are overlapping, not identical, since a law may be overbroad but not vague. *Ramos v. Town of Vernon*, 254 Conn. 799, 814, 761 A.2d 705, 716 (2000); *Dupres v. City of Newport*, 978 F. Supp. 429, 434 (D. R.I. 1997).

### (b) *Computer-Generated Virtual Images*

With the obscenity and child pornography jurisprudence reviewed above in mind, and with particular reference to *Ashcroft*, the defendant argues that the Virginia child pornography statute is vague and overbroad because it allegedly prohibits the possession of computer-generated virtual child pornography. This Court disagrees.

The provision in the Virginia child pornography statute prohibiting possession, which is at issue here and is set out at Va. Code § 18.2-374.1:1(A) (2002 version), provides that "[a]ny *person* who knowingly possesses any sexually explicit visual material utilizing or having as a subject a person less than eighteen years of age shall be guilty of a Class 1 misdemeanor." (Emphasis added.) In subsection D, the statute goes on to provide that "[a]ny *person* convicted of a second or subsequent offense under this section shall be guilty of a Class 6 felony." Va. Code § 18.2-374.1:1(D) (2002 version) (emphasis added). Sexually explicit visual material is defined as "a picture, photograph, drawing, sculpture, motion picture film, digital image, or similar visual representation which depicts sexual bestiality, a lewd exhibition of

nudity, as nudity is defined in § 18.2-390,[8] or a book, magazine, or pamphlet which contains such a visual representation."[9] Va. Code § 18.2-374.1(A) (2002 version). That section also provides, at subsection B, that "[t]he provisions of this section shall not apply to any such material which is possessed for a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose by a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, clergyman, prosecutor, judge, or other person having a proper interest in the material."

Before the Court can determine whether these code sections are facially vague and/or overbroad so as to constitute impermissible content-based restrictions on free speech, it must determine their meaning. *See Alexander*, 204 Ill. 2d at 476, 791 N.E.2d at 509 (discussing the relationship between overbreadth and strict scrutiny of content-based restrictions). In determining what the statute means, we start with the familiar rule of statutory construction providing that all legislation is presumed to be constitutional and the party attacking legislation has the burden of proving that it is unconstitutional. *Walton v. Commonwealth*, 255 Va. 422, 497 S.E.2d 869 (1998). Any reasonable doubt whether the statute is constitutional should be resolved in favor of its validity, and courts generally declare a statute invalid only if it is plainly repugnant to some constitutional provision. *Id.* Words and phrases used in a statute should be given their ordinary and usually accepted meaning unless a different intention is fairly manifest. *Woolfolk v. Commonwealth*, 18 Va. App. 840, 847, 447 S.E.2d 530, 534 (1994).

When interpreting a statute, we examine its provisions in their entirety, rather than by isolating particular words or phrases. *Ragan v. Woodcroft*, 255 Va. 322, 325, 497 S.E.2d 740, 742 (1998). However, when a statute's words are not sufficiently explicit, we may determine the intent of the legislature from a comparison of the statute's several parts *in pari materia*. *Virginia*

---

[8] "Nudity" is defined at § 18.2-390(2) as "a state of undress so as to expose the human male or female genitals, pubic area, or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered or uncovered male genitals in a discernibly turgid state." "Sexual conduct" is defined in subsection (3) of that section as "actual or explicitly simulated acts of masturbation, homosexuality, sexual intercourse, or physical contact in an act of apparent sexual stimulation or gratification with a person's clothed or unclothed genitals, pubic area, buttocks or, if such be female, breast." "Sexual excitement" is defined in subsection (4) of that section as "the condition of human male or female genitals when in a state of sexual stimulation or arousal." These sections refer to "human," and "person's," making clear their reference to actual children.

[9] The 1995 Amendment to Va. Code § 18.2-374.1(A) inserted "digital image."

*Soc'y for Human Life, Inc. v. Caldwell*, 256 Va. 151, 156, 500 S.E.2d 814, 816 (1998). *In pari materia* is the rule of statutory construction providing that statutes or sections of the same statute relating to the same subject "should be read, construed, and applied together so that the legislature's intention can be gathered from the whole of the enactments." *Alger v. Commonwealth*, 19 Va. App. 252, 256, 450 S.E.2d 765, 767 (1994). This rule "applies with peculiar force in the construction of a Code to the several parts thereof which relate to the same subject matter, were conceived by the same minds, prepared by the same hands, and adopted by the same legislative body." *South & W. Ry. v. Commonwealth*, 104 Va. 314, 321, 51 S.E. 824, 826 (1905). These are the statutory construction principles guiding our consideration of the code sections at issue.

Defendant asserts that Virginia's child pornography statute contains the same objectionable provisions found in the CPPA that the U.S. Supreme Court declared unconstitutional. However, Virginia's statute does not contain an infirmity similar to the challenged provisions of the CPPA in *Ashcroft*. Neither the Virginia Code section criminalizing possession of such material, nor the definition of "sexually explicit visual material," refer to images that *appear to be* of children, as did the objectionable portions of the CPPA. Furthermore, neither of these challenged code sections refer to images that *convey the impression* that they depict children. The statute specifically requires that the material at issue utilize or have as its subject a "person." Va. Code § 18.2-374.1:1(A) and (D). The language could scarcely be clearer. Similarly, Va. Code § 18.2-374.1(B) contains prohibitions on producing, distributing, participating in producing, electronically transmitting, displaying, purchasing, and possessing with intent to sell sexually explicit visual material which utilizes or has as a subject "a person" under eighteen years of age. The definitional section, when addressing the possession of "digital image[s]" uses the phrase "or similar visual representation." The clear import of this language is that something visual, as in a real person, is being captured. The separately-referenced section defining nudity indicates that it means a "state of undress so as to expose the *human* male or female genitals. . . ." (Emphasis added.) Va. Code § 18.2-390(2).

The plain language of the Virginia child pornography statute confines its application to images utilizing actual children. Applying the vagueness analysis outlined above, it is clear that a reasonable person is able to determine from the plain language of the statute what speech is permitted and what speech is prohibited. The language in the statute also clearly provides guidelines that protect against a standardless sweep by police, prosecutors, juries, and judges. Furthermore, the language of the statute provides adequate

notice of what speech is prohibited and what is allowed. Accordingly, the statute is not vague on the issue of whether it applies to images that utilize real children and it is therefore narrowly tailored to achieve its purpose, as required by the strict scrutiny standard applied to governmental restrictions on speech.

Turning our attention to the overbreadth issue, the clear language of the statute reveals that it only applies to images utilizing actual children. Applying the overbreadth analysis outlined above, it is clear that the language of the statute does not regulate substantially more speech than the Constitution allows to be regulated. The *Ashcroft* Court made it clear that a statute regulating possession of images utilizing real children was allowed by the First Amendment. The Virginia statute does not regulate beyond those limitations. The Virginia General Assembly not only included language in the statute to limit its application to images utilizing actual children, it also included language providing that the statute does not apply to any material having a "bona fide artistic, medical, scientific, educational, religious, government, judicial, or other proper purpose" by a range of individual groups having proper interest in such material. The Virginia statute also defines sexually explicit visual material with great specificity, requiring that it meet certain requirements such as lewdness. Even if it could be argued that the Virginia statute, at its margins, infringes on protected expression (which it does not), the Supreme Court has recognized that facial invalidation is inappropriate if the remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct. *Osborne*, 495 U.S. at 112, 110 S. Ct. at 1697, 109 L. Ed. 2d at 111. Accordingly, the statute is not overbroad on the issue of whether it applies to images that utilize real children, and it is therefore narrowly tailored to achieve its purpose, as required by the strict scrutiny standard applied to governmental restrictions on speech.

We now look at the compelling governmental interest requirement. As discussed above, in *Osborne*, the Supreme Court recognized that the threshold question was whether the state of Ohio could constitutionally proscribe the possession and viewing of child pornography and noted that the defendant argued that the Supreme Court's prior decision in *Stanley* compelled a contrary result. In distinguishing the Ohio statute from the one involved in *Stanley*, the Court noted that the primary motivation in *Stanley* was the legislature's intent to proscribe private possession of obscenity because such obscenity would poison the minds of its viewers. *Id.* at 109, 110 S. Ct. at 1696, 109 L. Ed. 2d at 109. The *Osborne* Court went on to note that the difference between the Georgia statute and the Ohio statute is obvious. Ohio "does not rely on a paternalistic interest in regulating Osborne's mind. Rather, Ohio has enacted [its child pornography statute] in order to protect the victims

of child pornography; it hopes to destroy a market for the exploitative use of children." *Id.* The *Osborne* Court concluded that Ohio had a compelling governmental interest sufficient to meet the strict scrutiny standard applied to content-based restrictions on speech. *Id.* at 110, 110 S. Ct. at 1696-97, 109 L. Ed. 2d at 110. In order to determine whether Virginia's General Assembly had a compelling governmental interest in prohibiting the possession of child pornography, comparable to that of Ohio, it is also necessary to review the Virginia statute.

Fortunately, the Virginia Supreme Court has already explained the purpose of the Virginia child pornography statute. The purpose of the Virginia child pornography statute, as it existed in 1982 before possession was prohibited and as described above by the *Freeman* Court, can easily be applied to the portion of the statute added in 1992 to criminalize possession. The legislative enactment of the possession statute clearly reflects the decision of the General Assembly to protect "its children from treatment it determines is physically or psychologically injurious to youth." *Freeman*, 223 Va. at 309, 288 S.E.2d at 465. This purpose is also consistent with the rationale in *Osborne* and *Ferber*. The Virginia possession statute was added to, and is part of, the child pornography statute that was in effect when *Freeman* was decided, and the justification for the incidental effect on speech is just as legitimate with regard to possession of child pornography as it was to the production and distribution of such pornography. Like Ohio, the Virginia General Assembly also had a compelling governmental interest sufficient to meet the strict scrutiny standard applied to governmental restrictions on speech.

To the extent that the words of the legislature are not sufficiently explicit, Virginia Courts may compare the several parts of the statute and gather the legislature's intention from the whole of the enactments. *Caldwell*, 256 Va. at 156, 500 S.E.2d at 816; *Alger*, 19 Va. App. at 256, 450 S.E.2d at 767. While this Court believes that the plain language of the statute is sufficiently clear, comparing the statute's several parts *in pari materia* also supports the plain language conclusion. Applying this principle, the plain language of the statute, and the statutory construction principles outlined above, the conclusion is inescapable that the Virginia child pornography statute applies to images that utilize, or have as their subject, an actual male or female child. The Court notes that, in 1995, the Virginia legislature amended Va. Code § 18.2-374.1(A) to include "digital image." It also amended subsection B, subdivision 3, to insert "by any means, including but not limited to computer-generated reproduction. . . ." Similarly, the legislature amended subdivision 4 and inserted "electronically transmit." The new language in both subdivisions

is immediately followed by the pre-existing language "which utilizes or has as a subject a *person* less than eighteen years of age." (Emphasis added.) The addition of this language, followed by the modification requiring that actual persons be utilized, reinforces the General Assembly's clear intent to prohibit possession of digital images of actual children. This conclusion is bolstered by a review of the Virginia obscenity statute, which is contained in the same article, Article 5, of the Virginia code where the child pornography statute is located.

The Virginia obscenity statute, at Va. Code § 18.2-372, defines "obscene" as "that which, considered as a whole, has as its dominant theme or purpose an appeal to the prurient interest in sex, that is, a shameful or morbid interest in nudity, sexual conduct, sexual excitement, excretory function or products thereof or sadomasochistic abuse, and which goes substantially beyond customary limits of candor in description or representation of such matter and which, taken as a whole, does not have serious literary, artistic, political, or scientific value." This language does not require that the material involve images of actual persons. Virginia Code § 18.2-374 prohibits the "possession with intent to sell, rent, lend, transport, or distribute any obscene item." Virginia Code § 18.2-373 provides that obscene items include obscene drawings and paintings, among other things. The obscenity statute does not prohibit the private possession of such obscene materials, presumably in an attempt to comply with the U.S. Supreme Court's holding in *Stanley.* Therefore, though not directly at issue in this case, it appears that the possession of computer-generated child pornography, that does not depict actual children in any way but meets the definition of obscenity established in *Miller,* is not prohibited in Virginia. However, possession of such material in conjunction with the prohibited acts of producing, publishing, transporting, distributing, selling, etc., is prohibited. *See United States v. Stevens,* 29 F. Supp. 2d 592, 602-03 (D. Alaska 1998), *rev'd on other grounds, United States v. Stevens,* 197 F.3d 1263 (9th Cir. 1999) (reviewing legal distinctions between possessing obscenity and child pornography). The fact that the Virginia obscenity statute does not require that such images be based upon real children, while the Virginia child pornography statute does contain language requiring child pornography be based upon images of real children, reinforces the conclusion that the General Assembly consciously made that distinction and that real children (rather than computer-generated virtual children or drawings of made-up children, etc.) are required for there to be a violation of the child pornography statute.

The direct rationale underpinning the *Ashcroft* holding is inapplicable to the Virginia statute at issue here, since *Ashcroft* was aimed at images which

"appeared to be" real children, but which were not images of real children.[10] Therefore, the plain language of the Virginia statute exhibits the legislature's intent to criminalize materials that utilize an actual child as their subject. Nowhere in the statute does it mention images that "appear to be" of children or images that are "virtual" in nature. Furthermore, as reviewed above, a reading of the rest of the statute and the article in which it appears, reinforces the plain language of the statute. Accordingly, the Virginia statute does not contain the same infirmity as the statute at issue in *Ashcroft*. The Virginia child pornography statute satisfies the strict scrutiny standard because the restriction of speech is justified by a compelling governmental interest and is narrowly tailored to achieve that interest. The statute is not vague or overbroad. However, our inquiry does not end here.

### (c) *Morphed Images*

The Supreme Court in *Ashcroft* did not specifically consider whether there was a constitutional prohibition on the possession of "morphed images" of actual children that are not one hundred percent computer-generated virtual images. Under § 2256(8)(C) of the CPPA, the definition of child pornography also includes images produced by "morphing," a "lower tech means of creating virtual images" whereby a "pornographer can alter innocent pictures of real children so that the children appear to be engaged in sexual activity." *Ashcroft*, 535 U.S. at 242, 122 S. Ct. at 1397, 152 L. Ed. 2d at 416; 18 U.S.C. § 2256(8). The *Ashcroft* Court stated that "[a]lthough morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in *Ferber*. Respondents do not challenge this provision [18 U.S.C. § 2256(8)], and we do not consider it." *Id.* Accordingly, to the extent that the Virginia statute encompasses "morphed images," it is necessary for this Court to apply the *Ferber* analysis in order to determine the constitutionality of the statute's prohibition on such morphed images. As reviewed above, in *Ferber*, the U.S. Supreme Court held that the government may prohibit the exhibition, sale, or distribution of child pornography even if it does not meet the *Miller* test for obscenity. As the *Ashcroft* Court noted, the *Ferber* Court's "judgment about

---

[10] The Texas Court of Appeals recently upheld the constitutionality of the Texas child pornography statute in the face of a challenge similar to that in *Ashcroft*. In the unpublished Opinion of *Watson v. State of Texas*, 2003 Tex. App. LEXIS 6711, *6 (Tex. App. 2003), the Court noted that neither the penalty nor the definitional sections of the Texas law refer to images that "appear to be" of children.

child pornography was based upon how it was made, not on what it communicated," and that should be the focus of our inquiry.

The language of the Virginia statute, refers to "digital image or similar visual representation" in its definition of "sexually explicit visual material." Va. Code § 18.2-374.1(A).[11] The definition of "sexually explicit visual material" is used throughout the child pornography statute to prohibit possession, production, distribution, electronic transmission, etc. The plain language of the definition encompasses something less than the one hundred percent mirror image of an actual child. This view is reinforced by the fact that the definition of "sexually explicit visual material" includes drawings and sculptures, which by their very nature are not one hundred percent mirror image representations of an actual child. It seems obvious that the General Assembly was more interested in how the visual image was made, i.e. whether an actual child was used, than what it communicated, i.e. whether it was obscene or whether it was a one hundred percent mirror image. However, as the *Ashcroft* Court noted, where a statute prohibits computer "morphing" of virtual images, rather than the creation of "original images," then the interests of real children are implicated though the analysis of such images is closer to that in *Ferber*. Because the Virginia statute includes a prohibition on such "morphed images," the statute must survive the *Ferber* analysis.

The *Ferber* strict scrutiny analysis outlined above focuses on whether the challenged law is "intrinsically related" to the sexual abuse of children, rather than on whether the images are obscene. *Ashcroft*, 535 U.S. at 249, 122 S. Ct. at 1401, 152 L. Ed. 2d at 420. In fact, an image might not meet the obscenity test, but might still be prohibited under *Ferber*. The five premises stated in *Ferber* and applied to the New York statute at issue there apply with equal force to the Virginia child pornography statute. The first premise, as referenced above, is that the state has an interest in protecting children from the physiological, emotional, and mental health impacts associated with the use of children as subjects of pornography. Where images of real children are "morphed" and the morphed image otherwise meets the definition of "sexually explicit visual material," it is irrelevant whether the original image has been modified in some way. Actual children are still being used and the state has an interest in preventing the damage inherent in the use of images utilizing actual children. If, for example, a real photograph of a child is modified such that

---

[11] Va. Code § 18.2-374.1(A) provides that "the term 'sexually explicit visual material' means a . . . drawing, sculpture . . . digital image, or similar visual representation which depicts sexual bestiality, a lewd exhibition of nudity . . . or sexual excitement, sexual conduct, or sadomasochistic abuse . . . or a book, magazine, or pamphlet which contains such a visual representation."

clothes are altered or removed, genitals added or enhanced, or actions are simulated, can there be any doubt that such actions are harmful to the physiological, emotional, and mental health of that child. One can, if forced to, imagine gradations of such activities. Taking one of the least damaging, one might consider the impact on a child if they are photographed in a swim suit and the images are subsequently altered. At the very least, it is necessary for the child pornographer to photograph or obtain the image of the child (which is potentially damaging in and of itself), not to mention the impact outlined below in the second premise if the child discovers such altered images, or is shown them, at a later time. Indeed, this is exactly what the Virginia Supreme Court held to be the purpose behind the original Virginia child pornography statute, "protecting … children from treatment it determines is physically or psychologically injurious to youth." *Freeman*, 223 Va. at 309, 288 S.E.2d at 465. This factor militates in favor of finding that such morphed images can be prohibited.

The second premise of *Ferber*, that the materials form a permanent record harmful to the child and that child sexual exploitation is hampered if distribution of child pornography is closed, also applies to morphed images under the Virginia statute. Whether the image is one hundred percent based upon an actual child or is partially based upon an image of an actual child, such materials still constitute a permanent record harmful to the child. Furthermore, criminalizing the possession of such materials tends to inhibit the distribution of child pornography by creating a disincentive to produce and possess such images, thereby reducing the necessary exploitation of children for the production of such images. Taking one of the arguably least damaging scenarios as an example, as noted above, imagine the potential impact on a child who discovered that their fully clothed image had been modified to remove clothes and add genitalia and/or simulate sexual activity. Therefore, this factor militates in favor of finding that such morphed images can be prohibited.

The third premise of *Ferber* is that advertising and selling of child pornography provides an economic motive for the production of such materials. Since the criminal prohibition on possession of child pornography, whether morphed or not, is clearly intended to inhibit the advertising and sale of such images, the Virginia statute furthers this premise and this factor militates in favor of finding that such morphed images can be prohibited.

The fourth premise in *Ferber* focused on the fact that the value of permitting the production of visual images of children is "exceedingly modest, if not *de minimis*. . . ." The Court also noted that the New York statute was not aimed at censoring any particular literary theme or portrayal of sexual activity.

The concern regarding any potential value in permitting the production of such images, as expressed by the *Ferber* Court, is not implicated by the Virginia statute. In fact, the Virginia statute contains a clause excluding from its coverage those items that are possessed for a "bona fide" ... "artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose. ..." Va. Code § 18.2-374.1:1(B). The statute clearly does not single out any particular literary theme, and just as in 1982 when *Ferber* was decided, there is no value in permitting the production of visual images of children. Therefore, this factor militates in favor of finding that such morphed images can be prohibited.

The fifth premise of *Ferber* is that classification of child pornography outside of First Amendment protection is justified by the need to protect the welfare of the child, though the nature of the harm to be combated requires that the state offense be limited to works that visually depict sexual conduct by children below a specified age. The Virginia statute limits the application of its prohibition to "sexually explicit visual material," and it applies to children less than eighteen years of age. While the statute at issue in *Ferber* used an age of sixteen, the *Ferber* Court referred to other states that defined a child as a person under eighteen years of age, and the Court did not voice objection to such a definition. *Ferber*, 458 U.S. at 764, n. 17, 102 S. Ct. at 3358, n. 17, 73 L. Ed. 2d at 1127, n. 17. Accordingly, the Virginia statute, which utilizes eighteen years of age as its standard, complies with the concerns expressed in this premise and this factor militates in favor of finding that such morphed images can be prohibited.

Among the other courts that have examined this issue since *Ashcroft*, the Illinois Supreme Court, evaluating its state child pornography statute in light of the *Ashcroft* ruling, recently found no constitutional infirmity in a provision of its statute that prohibited the possession of any "photograph or other similar visual reproduction or depiction by computer of any child." *Alexander*, 204 Ill. 2d at 481, 791 N.E.2d at 512. The Illinois statute used the same "similar visual representation" phrase contained in the Virginia statute. The *Alexander* court also found constitutional another part of its statute which provided that a "person commits the offense of child pornography who: (1) films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction or depicts by computer any child whom he knows or reasonably should know to be under the age of 18 ... where such child ... is (ii) actually or by simulation engaged in any act of sexual contact." *Id.* Noting the use of morphed image child pornography, the court implicitly upheld the prohibition on possession of morphed images of actual children, stating that

the above-referenced sections of the Illinois statute satisfies the strict scrutiny test under *Ferber*.

The prohibition on possession of morphed images in the Virginia child pornography statute is not unconstitutionally vague. A reasonable person is able to determine what speech is permitted and what speech is prohibited, thereby providing adequate notice to the public. Furthermore, the prohibition on such morphed images is not unconstitutionally overbroad. The statute does not regulate substantially more speech than the Constitution allows to be regulated, and the statute actually contains a provision excluding from its coverage images that have bona fide purposes, as reviewed above in the discussion regarding computer-generated virtual images. Accordingly, this Court finds that the prohibition in the Virginia child pornography statute includes morphed images of actual children, and that such prohibition is not overbroad nor vague, thereby meeting the strict scrutiny standard established by the U.S. Supreme Court in *Ferber*.

Va. Code § 18.2-374.1(E) provides that the "provisions of this section shall be severable and, if any of its provisions shall be held unconstitutional by a court of competent jurisdiction, then the decision of such court shall not affect or impair any of the remaining provisions." Accordingly, this Court finds that even if the coverage of morphed images was vague and/or overbroad, and hence unconstitutional, the remaining provisions would not be affected or impaired, such severability having been previously recognized in *Foster*.

## C. *Motion in Limine Regarding Burden of Proof*

Defendant argues that the Commonwealth has the burden of proving beyond a reasonable doubt that the images at issue are those of actual children. This issue has been litigated extensively since the Supreme Court's decision in *Ashcroft*. It appears that the decisions addressing this issue have fairly uniformly held that, where a defendant asserts that disputed images, entered into evidence on the prosecution's proffer, depicted computer-generated virtual children, the prosecution bears the burden of proving beyond a reasonable doubt that the images were of *actual* children. These Opinions were collected and reviewed in *May*, 829 A.2d at 1115-16. In *May* the defendant distributed and possessed child pornography on his home computer. Defendant asserted at trial that the images were virtual images, were of dolls, or were morphed images. In addressing this issue, the Court noted, among others, the following opinions reaching the conclusion that the prosecution bears the burden of proof beyond a reasonable doubt that the images were of

actual children: *United States v. Sims*, 220 F. Supp. 2d 1222, 1226 (D. N.M. 2002); *United States v. Oakes*, 224 F. Supp. 2d 296, 301-02 (D. Me. 2002); *see also United States v. Reilly*, 2002 U.S. Dist. LEXIS 19564 (S.D. N.Y. October 15, 2002); *United States v. Marcus*, 239 F. Supp. 2d 277, 283 (E.D. N.Y. 2003). The U.S. Court of Appeals for the Fourth Circuit, whose rulings govern federal courts in Virginia, adopted this same view in *United States v. Ellyson*, 326 F.3d 522, 531 (4th Cir. 2003).

The difficulty for the government in carrying this burden was predicted by Justice Thomas in his *Ashcroft* concurrence, 535 U.S. at 259, 122 S. Ct. at 1406, 152 L. Ed. 2d at 427. Justice Thomas noted that "technology may evolve to the point where it becomes impossible to enforce actual child pornography laws because the Government cannot prove that certain pornographic images are of real children." *Id.* He went on in his concurrence to state that in "the event this occurs, the Government should not be foreclosed from enacting a regulation of virtual child pornography that contains an appropriate affirmative defense or some other narrowly drawn restriction." *Id.*

The burden of proof that the government must carry is obviously intertwined with any affirmative defenses that apply to the statutory prohibition. While the Virginia statute currently contains no affirmative defense, an examination of the Supreme Court's discussion of the challenges created by the affirmative defense contained in the CPPA is instructive for our discussion of the burden of proof constitutionally necessary under the Virginia statute. In *Ashcroft*, the Supreme Court addressed the U.S. Government's contention that the CPPA was not overbroad because the statute "shift[ed] the burden to the accused to *prove* the speech is lawful." *Id.* at 255, 122 S. Ct. at 1404, 152 L. Ed. 2d at 424 (emphasis added). The prosecution in *Ashcroft* relied upon "an affirmative defense under the statute, which allows a defendant to avoid conviction for nonpossession offenses by showing that the materials were produced using only adults and were not otherwise distributed in a manner conveying the impression that they depicted real children. *See* 18 U.S.C. § 2252A(c)." *Id.* The Court stated that the "Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is not unlawful. An affirmative defense applies only after prosecution has begun, and the speaker must himself prove, on pain of a felony conviction, that his conduct falls within the affirmative defense." *Id.* The Court went on to observe that such a burden, under the CPPA, is not trivial because where "the defendant is not the producer of the work, he may have no way of establishing the identity, or even the existence, of the actors." *Id.* The Court also noted that, if "the evidentiary issue is a serious problem for

the Government, as it asserts, it will be at least as difficult for the innocent possessor." *Id.*

After exploring the difficulties in the use of an affirmative defense, the Court concluded that it "need not decide, however, whether the Government could impose this burden on a speaker" because "[e]ven if an affirmative defense can save a statute from First Amendment challenge, here the defense is incomplete and insufficient" because it allows prosecution in cases where the government cannot prove actual children were exploited in the production. The Supreme Court appeared to sound a cautionary note regarding the need for specificity in the use of affirmative defenses in such cases because of the burden it places on defendants. The import of the Supreme Court's concern seems clear: the burden of proof is on the government. In this case, the Commonwealth did not indicate at oral argument that it was unable to make the distinction between computer-generated virtual images and real/morphed images through testimony. However, the Commonwealth did indicate that it does not know the identity of the children shown in the four images that are the subject of the indictment in this case. Accordingly, the Court presumes for purposes of this Opinion and Order that the Commonwealth is capable of producing testimony indicating whether the images at issue are of actual children, even if they cannot be specifically identified. The method of such proof is a more complicated question.

This issue, of proving that images are of actual children, was addressed by the U.S. Court of Appeals for the Tenth Circuit recently in *United States v. Kimler*, 335 F.3d 1132 (10th Cir. 2003). In *Kimler* the defendant argued that *Ashcroft* established an "absolute requirement that, absent direct evidence of identity, expert testimony is required to prove that the prohibited images are of real, not virtual, children." *Kimler*, 335 F.3d at 1142. The *Kimler* court noted that there is direct language in the *Ashcroft* decision indicating that imaging technology might be good and getting better, but it is implausible to conclude that it has actually arrived at the point of indistinguishability. *Ashcroft*, 535 U.S. at 254 (noting that if "virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice"). Accordingly, the *Kimler* court concluded that fact finders "are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge." *Accord Grifin v. State of Montana*, 2003 MT 267, *P14 (Mont. Sept. 30, 2003).

In *Ellyson*, the U.S. Court of Appeals for the Fourth Circuit reviewed a case in which the defendant was convicted of possessing child pornography in

violation of the same federal statute at issue in *Ashcroft*, the CPPA. *Ellyson*, 326 F.3d at 531. That court concluded that the evidence presented to the jury "permitted the jury to convict Ellyson on both a constitutional and unconstitutional basis" and set aside the verdict. *Id.* However, the court concluded that retrial was appropriate because the evidence at trial was clear that at least one of the images involved an actual child, and "the other images depicting minors engaged in explicit sexual activity also may well involve actual children." *Id.* at 534. The *Ellyson* court then noted that the government "represents that it is clear simply from looking at many of the images on their face that actual children were involved." *Id.* at 535. The court responded that:

> As we have indicated, this is not apparent from the materials before us, which do not include the images. *See Richardson*, 304 F.3d at 1064 (concluding that disputed images depicted actual children based in part on appellate panel's review of images). But neither is it apparent that the images are computer-generated virtual pornography. In fact, there has been no suggestion whatsoever that such is the case. Accordingly, we are satisfied that retrial is appropriate.

The *Ellyson* and *Kimler* decisions recognize that it *may* be possible for the fact-finder to ascertain without the necessity of expert testimony whether actual children were used in the production of images. *See also United States v. Richardson*, 304 F.3d 1061, 1063 (11th Cir. 2002), *cert. denied*, 123 S. Ct. 930, 154 L. Ed. 2d 832 (2003) (court stating "[w]e have examined the images shown to the jury. The children depicted in those images were real; of that we have no doubt whatsoever"). A similar result was reached in *United States v. Deaton*, 328 F.3d 454, 455 (8th Cir. 2003), and *United States v. Hall*, 312 F.3d 1250, 1260 (11th Cir.), *cert. denied*, 123 S. Ct. 1646, 155 L. Ed. 2d 502 (2002). This Court finds these precedents from the U.S. Courts of Appeal for the Fourth, Eighth, Tenth, and Eleventh Circuits to be persuasive on this point and will follow the holdings from those decisions on this point. Accordingly, unless the defense presents evidence that the images at issue are indistinguishable from images utilizing actual children, the Commonwealth may seek to rely upon the images themselves without the necessity for expert opinion. Of course, the Commonwealth is also free to offer expert opinion on the issue, particularly if such evidence will assist the fact-finder.

This Court notes that the challenged possession statute does not contain an affirmative defense or evidentiary presumption regarding the issue of whether

an *actual* child is shown in recovered images.[12] Nor does the possession statute, pursuant to which the defendant was indicted, contain an affirmative defense or evidentiary presumption regarding the age of the child. However, Va. Code § 18.2-374.1(D) does contain a permissive evidentiary inference. As noted above, unlike traditional principles of standing, in the free speech arena, a person to whom a law constitutionally may be applied can argue that it would be unconstitutional as applied to others. In this case, the defendant has asserted that the Commonwealth is unable to carry its burden of proof because it is unable to identify the specific children shown in the images that form the basis of the indictment. A related issue, though not directly addressed by defense counsel at oral argument, is the Commonwealth's burden to prove the age of the persons depicted in these images. Having addressed the methods by which the Commonwealth might seek to prove that actual children were utilized in the production of the images at issue, the Court also notes that, unless the defendant can show an inability to do so, these same evidentiary principles apply to the Commonwealth's efforts to prove the age of the persons depicted in such images.

While there is no evidentiary presumption or affirmative defense in the possession statute, there is a rebuttable permissive evidentiary presumption in Va. Code § 18.2-374.1(D), which section prohibits production, distribution, solicitation, etc. of child pornography. The U.S. Supreme Court addressed the issue of prima facie statutory provisions recently in *Virginia v. Black*, 123 S. Ct. 1536, 1550-51, 155 L. Ed. 2d 535, 554-55 (2003), where defendants challenged the facial validity on overbreadth grounds of a provision in the Virginia cross-burning statute indicating that "any such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons." The Court recognized that the statutory presumption had been interpreted by the jury instruction, to the effect that "[t]he burning of a cross, by itself, is sufficient evidence from which you may infer the required intent." *Id.* at 1551, 23 L. Ed. 2d at 555. The Court concluded that it could not give the statutory presumption a narrow reading because the trial court had already interpreted the statutory presumption when it gave the jury instruction. *Id.* at 1551, 23 L. Ed. 2d at 557. Justice Thomas dissented and was joined by three other members of the Court who addressed the statutory presumption itself, without refusing to narrow its application because of the jury instruction. Noting the distinction between permissive or mandatory presumptions, Justice Thomas noted that the Virginia Supreme Court had described the presumption

---

[12] Affirmative defenses and evidentiary presumptions are both methods of offering contradictory evidence. *Finger v. State of Nevada*, 27 P.3d 66, 84 (Nev. 2001).

as a "statutorily supplied inference," *Id.* at 1566-67, 23 L. Ed. 2d at 574-75, and that such inferences do not compel a specific conclusion. Such inferences merely apply "to the rational potency or probative value of an evidentiary fact to which the fact finder may attach whatever force or weight it deems best." *Id.* Such an inference does not operate to shift the burden of production. Justice Thomas also explained that such an inference "is what our cases have termed 'a permissive inference or presumption'," and should be upheld unless "no rational trier could make a connection permitted by the inference." *Id.* Justice Thomas concluded, *"not* making a connection between cross burning and intimidation would be irrational." *Id.* In the same way, not making a connection between distribution, solicitation, and production of child pornography and a person's possession of sexually explicit visual images that depict or present the appearance of being persons less than eighteen years of age would be irrational. The Court addresses this issue because the defendant has asserted a broad facial challenge to the child pornography statute, and Va. Code § 18.2-374.1 contains both the definition of "sexually explicit visual material" used in the possession section, as well as the permissive inference involving age. For that reason, and because of the need to prove age at trial, this Court addresses the issue. Since this Court is not faced with a particular construction having been placed on the statutory language, such as was the case with the jury instruction *Black* (note Justice Scalia's dissent), this Court will apply the construction recognized in the Thomas dissent, which follows the Virginia Supreme Court's construction, and treat the prima facie presumption as a permissive inference or presumption. *Accord Hause v. Kentucky*, 83 S.W.3d 1 (Ky. 2001); *People ex rel. Tooley v. Seven Thirty-Five East Colfax, Inc.*, 697 P.2d 348, 362 (Colo. 1985). Accordingly, the rebuttable permissive presumption contained in Va. Code § 18.2-374.1(D) does not appear to contain any constitutional infirmity, being neither vague nor overbroad.

The Court grants defendant's motion *in limine* to exclude evidence that fails to prove, beyond a reasonable doubt, that the images are those of real children, in whole or in part.

## D. *Multiple Counts*

Defendant moves to dismiss counts one through three of the indictment, which are second or subsequent offense counts, because the images that are the subject of those counts cannot be distinguished temporally from the image that forms the basis of count four. Defendant relies on various cases supplied to the Court as support for this argument. The defendant submitted *Acey v.*

*Commonwealth*, 29 Va. App. 240, 511 S.E.2d 429 (1999), in support of this position. The Court of Appeals explained the "single possession doctrine" in that case and relied upon *Kelsoe v. Commonwealth*, 222 Va. 197, 199, 308 S.E.2d 104, 104-05 (1983). *Acey* addressed the single possession doctrine in the context of a trial court's ruling that possession by a convicted felon of two or more firearms at the same time and place constitutes multiple criminal violations. Among other cases submitted to the Court at oral argument, defendant provided *United States v. Dunford*, 148 F.3d 385, 390 (4th Cir. 1998), arguing that "what constitutes the allowable unit of prosecution 'cannot be answered merely by a literal reading' of the statute" and any "ambiguity should be resolved in favor of lenity." However, in the face of these cases, the Court recognizes that the single possession doctrine was previously examined in the context of one of the child pornography statutes at issue here.

The Virginia Court of Appeals reviewed this issue, though in an unpublished disposition, in the case of *Slavek v. Commonwealth*, 2001 Va. App. LEXIS 553, *8, Record No. 2452-00-1 (October 9, 2001) (Judge Bray writing for unanimous panel). In *Slavek*, the defendant was observed and videotaped by a police officer viewing and printing four sexually explicit images of children at the public library. The defendant was found guilty in General District Court of a misdemeanor child pornography possession charge. The defendant was subsequently indicted on four counts of production of sexually explicit items involving children, citing Va. Code § 18.2-374.1:1, without particularizing the alleged conduct. The four reproduction indictments similarly mirrored one another, charging that defendant knowingly took part in the reproduction of sexually explicit visual material utilizing a person less than eighteen years of age. Each indictment alleged the same offense date.

On appeal, the defendant challenged the four convictions for reproduction as a violation of the constitutional guarantee against double jeopardy, arguing that he was charged with multiple counts of the "same production." The Court there said that, when considering multiple punishments for a single transaction, the controlling factor is legislative intent. *Kelsoe*, 222 Va. at 199, 308 S.E.2d at 104. The legislature determines the appropriate unit of prosecution and sets the penalty for separate violations. *Jordan v. Commonwealth*, 2 Va. App. 590, 594, 347 S.E.2d 152, 154 (1986). As the Court of Appeals noted in *Slavek*, although multiple offenses may be the same, an accused may be subjected to legislatively authorized cumulative punishments. *Shears v. Commonwealth*, 23 Va. App. 394, 401, 477 S.E.2d 309, 312 (1996) (noting that judicial punishment in excess of legislative intent offends the Double Jeopardy clause).

The *Slavek* Court of Appeals then examined the Virginia Supreme Court's ruling in *Educational Books, Inc. v. Commonwealth*, 228 Va. 392, 323 S.E.2d 84 (1984), in which two police investigators purchased magazines from the defendant store and the defendant challenged seven of the nine counts against it arguing they violated the constitutional prohibitions against double jeopardy as provided in the U.S. Constitution, Amend. V, and the Constitution of Virginia, Art. 1, § 8. As they noted, the first investigator purchased a single magazine and three transparent packages, each containing three different magazines. At the trial, five of these magazines were introduced into evidence. The second investigator purchased four magazines, all of which were introduced into evidence. The defendant was then convicted of nine sales in violation of Va. Code § 18.2-374. *Id.* at 394, 323 S.E.2d at 85. Accordingly, the Virginia Supreme Court determined that the unit of prosecution in the obscenity statute was a single item proscribed by the statute, reasoning that Va. Code § 18.2-374 prohibits the sale of "any obscene item." The Court also noted that Va. Code § 18.2-373 provides that "obscene items" shall include "any obscene ... magazine." The *Educational Book, Inc.* Court went on to note that the "gravamen of the offense is the sale of a single obscene item." *Id.* at 395, 323 S.E.2d at 86. The *Slavek* Court noted that the legislature evinced a similar intent in Va. Code § 18.2-374.1, with each reproduction of an item of sexually explicit visual material constituting a "unit of prosecution." The *Slavek* Court cited for support *Kelso*, 226 Va. at 198-99, 308 S.E.2d at 104 (accused convicted of three violations for simultaneously brandishing the same firearm at three persons); *Sullivan v. Commonwealth*, 16 Va. App. 844, 847, 433 S.E.2d 508, 510-11 (1993) (defendant convicted of two robberies and related firearm offenses from two clerks at the same video store); *Jordan*, 2 Va. App. at 597, 347 S.E.2d at 156 (defendant convicted of two robberies and related firearm offenses from employees of a restaurant.).

After reviewing these cases, the *Slavek* Court observed that the defendant in their case was observed accessing and reproducing by computer four distinct illicit images on four separate occasions over a period of several hours, and the Commonwealth introduced the four pictures and the videotape depicting the defendant printing these four pictures at the library. *Slavek*, 2001 Va. App. LEXIS 553, *11-12. The *Slavek* Court concluded that "[s]uch evidence sufficiently proved beyond a reasonable doubt that defendant committed four distinct violations of Code § 18.2-374.1, each properly subject to prosecution and punishment." *Id.* In the same way, the defendant in this case is alleged to have possessed four separate items of sexually explicit visual material. At trial, the Commonwealth is required to prove beyond a reasonable

doubt that these are four separate items and that each image represents an actual person covered by the statute.

Substituting the facts of the case presently before this Court for the specific facts in *Educational Books*, it can be said here, as it was there, that "[t]he legal test in each instance was the same, but each [image] was different. Consequently, the jury had to apply the same legal principles to [four] different sets of evidentiary facts, *i.e.*, the [four images] comprising the basis for the [four] counts in the indictment. Different evidence, therefore, was used by the Commonwealth in prosecuting each of the [four] counts. Thus, even under the 'same evidence' test, there were [four] separate offenses. We hold that the [defendant's] double jeopardy rights were not violated by the [four] convictions." *Educational Books*, 228 Va. at 395-96, 323 S.E.2d at 86. The same principles apply here. In defining the items that form the basis of the violation, Va. Code § 18.2-374.1:1 provides that any person who knowingly possesses "any" sexually explicit visual material within the parameters set out in the statute shall be guilty of possession. The definition of "sexually explicit visual material," as the *Slavek* Court noted, contains the following words: "a" … "digital image or similar visual representation." When this language is considered against the backdrop of the U.S. and Virginia Supreme Courts' child pornography and obscenity jurisprudence, it is clear that the purpose recognized by the Courts in justifying criminalization of child pornography possession is protection of children from exploitation. Therefore, since the legislature enacted the child pornography statute to prevent exploitation of children, criminalizing possession of each image furthers that purpose. Accordingly, because this Court finds the unpublished disposition in *Slavek* persuasive, and because this Court believes that unpublished disposition consistent with the purposes of the statute at issue, this Court finds that, if proven, each child pornography image possessed by the defendant may properly form the basis for a distinct violation. Therefore, defendant's motion to dismiss counts one through three is denied.

### III. *Conclusion*

The defendant's motion to dismiss the indictment on the grounds that the Virginia child pornography statute is unconstitutional is denied. The defendant's motion *in limine,* seeking to exclude evidence that fails to prove beyond a reasonable doubt that the images at issue are images of real children, is granted in part and denied in part. To the extent this ruling on the motion *in limine* is tentative, conditional, or provisional, counsel are cautioned to renew their objections at trial when final rulings occur. The defendant's motion to

dismiss counts one through three on the grounds they are impermissibly duplicative of count four is denied.

The objections to motions decided in this Opinion and Order, as stated when the Court delivered its preliminary ruling from the bench on September 3, 2003, are preserved, and exceptions are noted for the reasons stated at such argument. The Court therefore dispenses with the Rule 1:13 counsel endorsement requirement. It is so ordered.

November 12, 2003

Prior to the October 27, 2003, trial of this matter, the Court addressed defendant's pre-trial motions to dismiss and motion *in limine* in an Opinion and Order issued on October 10, 2003. However, during the course of the trial, a dispute arose as to whether there was knowing possession by the defendant of certain sexually explicit visual material, involving juveniles, which was found in the temporary Internet file of the defendant's computer cache. While the Court delivered its finding of fact and conclusions of law from the bench on October 28, 2003, this Opinion and Order provides a brief overview of the evidence presented at trial and addresses the question of whether the defendant knowingly possessed the images found in the cache of his computer. This is an issue of apparent first impression in the Commonwealth of Virginia. This Opinion and Order addresses the "knowing possession" issue and also serves as the conviction order in this matter.

### I. *Factual and Procedural Background*

The defendant was indicted on May 1, 2003, on four counts of knowingly possessing, on or about June 29, 2002, sexually explicit visual material, which utilizes or has as a subject a person less than eighteen years of age, in violation of Va. Code § 18.2-374.1:1, Virginia's child pornography possession statute. Count four is a first offense misdemeanor count, while counts one through three are second and subsequent offense felony counts. In its October 10, 2003, Opinion and Order, the Court accepted the stipulation of the Commonwealth and the defendant that the applicable version of the criminal statute is that in existence at the time of the crimes alleged.

The defendant was represented at the October 27, 2003, trial by the Assistant Public Defender, Steve Turri, and the Commonwealth was represented by the Assistant Commonwealth's Attorney, Elizabeth Fitzwater. The defendant was arraigned, and, after private consultation with his counsel, he pleaded not guilty as charged in the indictment. This plea was tendered in

person by the defendant after having been first advised by his counsel and the Court of his right to a trial by jury. The defendant knowingly and voluntarily waived trial by jury with the concurrence of the attorney for the Commonwealth and the Court. The Court then proceeded to hear and determine the case without the intervention of a jury, as provided by law.

The first witness was Portsmouth Police Department Officer Swanda, who testified that he responded to the scene of the defendant's residence based upon a call from the defendant's landlords, Mark and Alexandra Reed. Officer Swanda reviewed various suspected child pornography material, and Detective Lodge then joined him at the same scene. Detective Lodge testified that he spoke with the Reeds, and they told him they believed there was child pornography in the defendant's apartment, which was located in a small building behind their home. Lodge testified that he went inside the residence, found the computer already turned on, and saw what he described as a "screen saver" on the computer with the image of a partially clad young female appearing to be a juvenile. Lodge also found numerous computer printouts of stories involving sexual activity by juveniles. Lodge stated that the Reeds reported that the defendant had recently moved out of the apartment but had left the computer, the stories, and various other items. Detective Lodge remained until Officer Jackson arrived and secured the evidence in the apartment. Officer Jackson testified that he then recovered the computer processing unit/hard drive, monitor, mouse and keyboard, computer printouts, and various adult magazines. All of these items were admitted into evidence except the adult magazines.

John M. de Triquet, M.D., a forensic pediatrician, next testified, after being accepted as an expert in that field. He reviewed the methods by which forensic pediatricians utilize the Tanner Scale for assessing the stages of sexual development in juveniles and stated that approximately 99.7% of the population develops in accord with the Tanner Scale stages. After reviewing the four images at issue in this case, Dr. de Triquet explained his analysis of each image and testified that in his opinion each of the four images presented to him were images of actual children under eighteen years of age.

Defendant's landlords, Alexandra and Mark Reed, also testified. Alexandra Reed stated that the defendant had given verbal notice to her that he was moving out and that she had a law suit pending against him for unpaid rent at the time she and her husband discovered the computer and printouts in the apartment. She stated that she and her husband turned the computer on and the screen saver appeared, showing the image of what appeared to be a partially clad juvenile female. She testified that she had seen the computer in the apartment when the defendant was still living there but that she had not

seen the defendant at the apartment for a few weeks. She said that the defendant had lived in the apartment and that while she had seen visitors at the apartment with the defendant, no one else had legal access to the apartment other than her and her husband. Ms. Reed testified that she and her husband waited two days after their initial discovery of the screen saver image before calling the police because they were trying to determine how best to handle the situation since they knew the defendant's parents.

Mark Reed testified that, while the defendant was living in the apartment he and his wife rented to him, Reed had seen the defendant operating the computer at issue. Mr. Reed also said that he had been in the apartment sometime in the prior one to two years when defendant discussed mechanical difficulties he was having with the computer's printer. Reed said that he turned the computer on when he and his wife entered the apartment on June 27, 2002, and immediately saw the image of the partially clad "young girl." Reed turned the computer off, waited two days, and then called the Portsmouth Police Department, turning the computer back on (of his own volition) when the police responded on June 29, 2002. He also stated that the only keys to the apartment, to his knowledge, were those he and his wife held and those of the defendant.

Detective Paula Fisher testified that she retrieved the defendant's computer from the property and evidence room at the Portsmouth Police Department and transported it to the Virginia Crime Lab for analysis by Agent Rudy Jones. Agent Rudy Jones of the Virginia State Police testified that he is with the Economic and Cyber Crimes Investigation Unit. The Court recognized him as a computer forensic examination expert after reviewing his qualifications. He testified that he made a mirror image of the computer hard drive from defendant's computer. He found that the computer had hardware and software for accessing the internet, with Internet explorer and AOL. He was provided with search criteria asking that he search the hard drive for images of juveniles, and he stated that he located 260 suspect files. Among those files were the four images at issue. He first described the "wall paper"[13] image (Commonwealth's Exhibit # 6) that appeared when the computer was turned on as an image he recovered during this search. He stated that the wall paper image would only appear if it had been "manually" placed at that location. He stated that because the computer clock was not functioning, he could not be sure whether this image was downloaded at the same time that the other three images at issue were placed in the cache/temporary internet

---

[13] This was previously described as a screen saver, but Agent Jones indicated it was "wall paper."

file. He then explained that the next image, which showed a partially clad young female in Commonwealth's Exhibit # 8, revealed a time from the computer's "carryover properties" of 8:16 p.m. on March 30, 2001. The next image, which showed a young female completely nude in Commonwealth's Exhibit # 9, reflected a time of 8:15 p.m. on March 30, 2001. The final image, which showed a completely nude juvenile boy in Commonwealth's Exhibit # 10, reflected a time of 8:18 p.m. on March 30, 2001.

On cross-examination, Agent Jones confirmed that the images shown in Commonwealth's Exhibits eight through ten were recovered from the computer's AOL 4.0 directory cache, which he also described as "temporary internet files." He stated that a computer operator cannot normally stop these graphics from being placed in the cache when accessing a website. He also testified that it was possible to alter the times shown on Commonwealth's Exhibits eight through ten, if someone were sufficiently familiar with the computer's operation. Agent Jones confirmed that, if a computer operator did not know of the automatic download of images into the cache, there is no mechanism on the computer screen that notifies a user of the fact that the viewed images have been placed in the cache. However, he said that an image must appear on the computer screen before it would be automatically placed in the cache. He further stated on cross-examination that it is possible that while visiting one web site, a "pop-up" image can appear on a screen directing a person to another web site. He stated that this frequently happens with the same kind of items, such that, if a computer operator were viewing a child pornography web site, pop-ups would appear for other child pornography web sites.

Agent Jones then reviewed a list of "search terms" that he recovered from the defendant's computer. He stated that a computer operator had typed in these search terms. They included the following: Lolitas, pre-teens, panties, pre-teen pictures, pedophilia, girliescam, and freehardcoresex.com. He said that "Lolita" is a frequently-used code word for searches seeking child pornography, though he admitted it is also the name of a novel.

Agent Wells of the Virginia State Police High Technology Crime Unit testified to his specialized training in computer crime virtual pornography issues. The Court found that he is an expert in computer forensics. He went on to explain his training in identification of computer-generated images (hereafter "CGI"), which are images that are one hundred percent computer created, and was certified as an expert in CGI. He explained that CGI consists of polygons, which comprise pixels. He said that polygons are formed from straight lines, so that a creator of CGI cannot re-create an image with accurate curves because such attempted-curves are really a number of straight lines that

are formed together to look like curves. He further testified to his use of colorization, texture, shadowing, reflective light, and pixelization in determining whether an item is CGI versus an image of an actual person. Agent Wells testified that, at the request of Agent Jones, he reviewed Commonwealth's Exhibit 6, and Exhibits 8–10. He then testified in detail as to why each of those exhibits show images of actual children, rather than CGI, and offered his expert opinion that each image was that of an actual person.

Agent Wells presented several CGI of child pornography for comparison and stated that based upon the best information he has obtained, it will be some years before CGI can be created that are indistinguishable from images of actual persons. He also testified that in his expert opinion, none of the images were morphed images. Morphed images are those images which in part utilize actual images of persons, but with supplemental generation/enhancement.[14] He said that he is capable of distinguishing between images of actual persons and morphed images because of the different appearances created when pixels are cut and pasted on to images of actual persons.

At the conclusion of the Commonwealth's case-in-chief, the defendant moved the Court to strike the Commonwealth's evidence and the Court denied the motion. The defendant presented no evidence. The defense then renewed its motion to strike and the Court denied the motion. After closing arguments, the Court adjourned for the day and reconvened on October 28, 2003, to announce its findings of fact and conclusions of law, finding the defendant guilty on all four counts of the indictment.

A central issue in the closing arguments was the question of whether the defendant could be convicted of knowingly possessing the images reflected in Commonwealth's Exhibits eight through ten since, according to defense counsel, these images could have possibly appeared on the defendant's computer screen as "pop-ups" from a website other than one intentionally accessed by defendant and since none of those images were "manually" downloaded into the computer, though they were cached as temporary internet files. As noted above, while having provided a brief overview of the evidence presented at trial, the purpose of this Opinion and Order is not to address each element of the crimes charged and compare them with the evidence. The Court addressed those issues in its findings of fact and conclusions of law presented from the bench on October 28, 2003. The purpose of this Opinion and Order is to reflect the Court's findings of guilt on each count of the indictment and review its ruling on the knowing possession of the cached images.

---

[14] A more complete discussion and explanation of such images is contained in the Court's October 10, 2003, Opinion and Order.

## II. *Discussion*

The provision in the Virginia child pornography statute prohibiting possession, which is at issue here and is set out at Va. Code § 18.2-374.1:1(A) (2002 version), provides that "any person who *knowingly possesses* any sexually explicit visual material utilizing or having as a subject a person less than eighteen years of age shall be guilty of a Class 1 misdemeanor." (Emphasis added.) In subsection D, the statute goes on to provide that "any person convicted of a second or subsequent offense under this section shall be guilty of a Class 6 felony." Va. Code § 18.2-374.1:1(D) (2002 version). Sexually explicit visual material is defined as "a picture, photograph, drawing, sculpture, motion picture film, *digital image*, or similar visual representation which depicts sexual bestiality, a lewd exhibition of nudity, as nudity is defined in § 18.2-390, or a book, magazine, or pamphlet which contains such a visual representation."[15] (Emphasis added.) Va. Code § 18.2-374.1(A) (2002 version).

The Virginia child pornography statute does not define "possession," nor has this Court found any opinions of Virginia courts addressing this issue.[16] However, the general rule in Virginia is that, when interpreting a statute, we examine the plain language of its provisions in their entirety, rather than by isolating particular words or phrases, and give such language its ordinary and usually accepted meaning. *Councill v. Commonwealth*, 37 Va. 610, 614, 560 S.E.2d 472, 473 (2002); *Ragan v. Woodcroft*, 255 Va. 322, 325, 497 S.E.2d 740, 742 (1998).

The U.S. Court of Appeals for the Tenth Circuit recently addressed the level of proof necessary to show knowing possession of child pornography in *United States v. Tucker*, 305 F.3d 1193, 1204 (10th Cir. 2002), *cert. denied*, 537 U.S. 1223, 123 S. Ct. 1335, 154 L. Ed. 2d 1082 (2003). In *Tucker*, the defendant in a child pornography possession prosecution argued that he did not possess child pornography, but merely viewed it on his Web browser. He conceded that he knew that when he visited a Web page, the images on the Web page would be sent to his browser cache file and thus saved on his hard drive. However, he contended that he did not desire the images to be saved on

---

[15] The 1995 Amendment to Va. Code § 18.2-374.1(A) inserted "digital image."

[16] The Virginia Court of Appeals upheld a conviction involving the viewing and printing, while at a public library, of four sexually explicit images of children in the unpublished Opinion of *Slavek v. Commonwealth*, 2001 Va. App. LEXIS 553, *8, Record No. 2452-00-1 (October 9, 2001). While the Court of Appeals panel did not define possession, it upheld each separate conviction, noting that the defendant was seen accessing, viewing, and *printing* each image. Therefore, we can infer that the *accessing, viewing, and printing* of the image was sufficient under the Statute to constitute knowing possession.

his hard drive and deleted the images from his cache file after each computer session. *Id.* The federal statute at issue in that case prohibited an individual from "knowingly possessing" any material containing images of child pornography. The *Tucker* Court noted that the statute did not define possession, but that "possession is defined as 'the holding or having something (material or immaterial) as one's own, or in one's control.' *Oxford English Dictionary* (2d ed. 1989)." The *Tucker* Court also noted that it had defined "knowing possession" in the drug context as encompassing situations in which an individual "knowingly holds the power and ability to exercise dominion and control" over the narcotics. *Id., citing United States v. Simpson*, 94 F.3d 1373, 1380 (10th Cir. 1996). The defendant in *Tucker* argued that "because he did not personally save, or 'download,' the images to his hard drive; he had no control over them." However, the *Tucker* Court concluded that the defendant did have control over the files present in his Web browser cache files and noted, among other things, that the district court observed that he had volitionally reached out for the images by visiting child pornography websites. *Tucker*, 305 F.3d at 1199, 1204.

The Customs Agent that testified in *Tucker* explained that an image in a cache file can be attached to an email, posted to a newsgroup, printed as a hard copy, recalled and viewed, or placed on a disk. *Tucker*, 305 F.3d at 1205. The Agent also testified that anything you could do with any other file could be done with the cached file. The defendant in *Tucker* argued that his Web browser saved the images against his will and he did not voluntarily cache the files. The *Tucker* Court concluded that the defendant "intentionally sought out and viewed child pornography knowing that the images would be saved on his computer," even if he wished they were not being automatically saved. The Court was also careful to say that it offered no opinion:

> on whether the mere viewing of child pornography on the Internet, absent caching or otherwise saving the image, would meet the statutory definition of possession. We likewise do not address the question whether an individual could be found guilty of knowingly possessing child pornography if he viewed such images over the Internet but was ignorant of the fact that his Web browser cached such images.

*Id.* In the present case the defendant did not testify, and no direct evidence was presented, as to whether he realized images he viewed were being saved to his cache file.

The quantum of evidence necessary to prove knowing possession was also addressed in *United States v. Perez*, 247 F. Supp. 2d 459, 484, n. 12 (S.D. N.Y. 2003), where the defendant moved to suppress evidence of child pornography obtained with a search warrant. In reviewing the federal child pornography statute, which prohibits the knowing possession of such images, that Court observed that, under the current state of federal law, "whether the statute reached mere internet 'browsing' is something of an open question." *Id.* The *Perez* Court noted that the statute does not prohibit the "viewing" of such images. However, the *Perez* Court went on to note that, in at least one case, a district court acquitted a defendant on a count of child pornography possession and "explained that one cannot be guilty of possession for simply having viewed an image on a web site, thereby causing the image to be automatically stored in the browser's cache, without having purposely saved or downloaded the image." *Id.*, citing *United States v. Stulock*, 308 F.3d 922, 925 (8th Cir. 2002) (where the court of appeals recited the holding of the district court on this issue).

In deciding whether the defendant knowingly possessed the cached images in this case, the Court finds it helpful to analogize possession via the computer to other methods of possession. However, the starting point for such an examination must be the language of the statute. The Virginia statute does not prohibit viewing, it prohibits possession. The Virginia Supreme Court has recognized that the word "possession" has "many and various meanings." *Borum v. National Valley Bank of Staunton*, 195 Va. 899, 907, 80 S.E.2d 594, 598 (1954). For example, it can mean that one can exercise his power over property at pleasure, or that one has custody and control over something that is subject to disposition. *Id. Black's Law Dictionary* defines possession as "the detention and control, or the manual or ideal custody, of anything which may be the subject of property, for one's use and enjoyment, either as owner or as the proprietor of a qualified right in it, and either held personally or by another who exercises it in one's place and name." *Black's Law Dictionary* 1047 (5th ed. 1979). *Webster's Dictionary* defines "possess" as "to have as property," "to acquire mastery of or have knowledge of," "to gain or exert influence over," and "to control or maintain in a given condition." *Webster's II College Dictionary* 861 (2001). In the present context, this Court synthesizes these definitions and cases in the computer context and asks the following question: Did the defendant reach out for and control the images at issue.

The Court also observes that asking whether a defendant has reached out for and controlled the images recognizes and promotes the purpose behind the statute. As the Court noted in its October 10, 2003, Opinion and Order, both the Virginia Supreme Court and U.S. Supreme Court have recognized that the

purposes behind such statutes include protection of the physical and psychological well being of juveniles, *New York v. Ferber*, 458 U.S. 747, 756-57, 102 S. Ct. 3348, 3354, 73 L. Ed. 2d 1113, 1122 (1982); *Freeman v. Commonwealth*, 223 Va. 301, 305, 309, 288 S.E.2d 461, 463, 465 (1982), and destruction of the market for the exploitative use of children. *Osborne v. Ohio*, 495 U.S. 103, 109, 110 S. Ct. 1691, 1696, 109 L. Ed. 2d 98, 109 (1990); *Freeman*, 223 Va. at 309, 288 S.E.2d at 465. If there is no reaching out for and controlling of such images, then presumably juveniles will be in less demand for such exploitation, with a resulting reduction in physical and psychological harm.

By analogy, one might consider the following hypothetical. If a person walks down the street and notices an item (such as child pornography or an illegal narcotic) whose possession is prohibited, has that person committed a criminal offense if they look at the item for a sufficient amount of time to know what it is and then walks away? The obvious answer seems to be "no." However, if the person looks at the item long enough to know what it is, then reaches out and picks it up, holding and viewing it, and taking it with them to their home, that person has moved from merely viewing the item to knowingly possessing the item by reaching out for it and controlling it. In the same way, the defendant in this case reached out for prohibited items and, in essence, took them home.

There are several other pieces of evidence in this case that provide convincing indicia of knowing possession. The Internet searches conducted by the defendant, as revealed by Agent Jones, show that he was reaching out for images involving child pornography. As the testimony revealed, one of his search terms was "Lolitas," a common term in the search for child pornography according to the testimony. *See United States v. Grimes*, 244 F.3d 375, 379, n. 7 (5th Cir. 2001) (noting "Lolita" is often a code word for child pornography). Further terms included pedophilia, pre-teen pictures, etc. Additionally, the defendant possessed numerous computer printouts of stories involving graphic sexual activity of juveniles. *Id.* at 384 (noting relevance of such items), *see also United States v. Hall*, 2000 U.S. App. LEXIS 170, *9-10 (unpublished disposition 6th Cir. 2000) (noting relevance of such materials to prove knowledge and intent). These stories reveal the defendant's interest in sexual activity of juveniles. This evidence, in conjunction with the defendant's knowing possession of another child pornography image which had to be manually downloaded onto the wall paper of his computer and which was visible every time the computer was turned on, combines to show beyond a reasonable doubt that the defendant reached out for these images with the intent to control and have dominion over them. The defendant acquired

mastery of and had control of these images. The defendant's Internet search terms, stories involving graphic juvenile sexual activity, and the child pornography image manually displayed on his computer wall paper, sufficiently answers any doubts raised by defendant regarding the manner in which these three cached images found their way into the temporary internet files on his computer. Defendant's actions as a whole prove, beyond a reasonable doubt, that he reached out for and controlled the three images contained in his computer's cache/temporary internet file.

### III. *Conclusion*

Having heard all the evidence and argument of counsel on October 27 and 28, 2003, the Court finds the defendant guilty as charged in the indictment. The defendant is referred for a pre-sentence investigation and report. The Court directs the probation officer of this Court to thoroughly investigate and report to the Court as prescribed by law, and this case is continued for sentencing to January 29, 2004, at 9 a.m. in the Portsmouth Circuit Court. The Court certifies that the accused and his counsel were present in person at every stage of the proceedings. The Court dispenses with the Rule 1:13 counsel endorsement requirement. It is so ordered.